UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA 3:27

CASE NO. _____

06-81128

CIV-HURLEY

HOPKINS

ADVANCED BODYCARE SOLUTIONS, )
LLC, )
)
         Plaintiff, )
)
v. )
)
THIONE INTERNATIONAL, INC. )
)
         Defendant. )
_____ )

## NOTICE OF REMOVAL

**TO: THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

       Defendant, THIONE INTERNATIONAL, INC. ("THIONE" or "Defendant"), by and

through its undersigned counsel, hereby files this Notice of Removal of the instant action from

the 15th Judicial Circuit, Palm Beach County, Florida, to the United States District Court for the

Southern District of Florida, and, in support thereof, states as follows:

       1.     The instant action was originally filed by Plaintiff, Advanced Bodycare Solutions

LLC, ("Plaintiff"), and is now pending, in the 15th Judicial Circuit, Palm Beach County, Florida,

(Case No. 06-CA-10109 MB) (the "State Court Action"). The Amended Complaint in the State

Court Action asserts six causes of action. Defendant was first served with the original Complaint

along with the Amended Complaint.

       2.     This Court has original jurisdiction over this case pursuant to Title 28 U.S.C. § 1332

(diversity of citizenship) because: 1) Plaintiff is incorporated in Delaware and has its principal place

of business in Florida, and thus pursuant to 28 U.S.C. § 1332(c)(1) is a citizen of Delaware and

Florida; 2) Defendant is incorporated in Georgia and has its principal place of business in that State, and thus pursuant to 28 U.S.C. § 1332(c)(1) is a citizen only of Georgia; and 3) the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs. See Amended Compl. ¶¶ 68 and 69 (filed Nov. 7, 2006) (included in Exhibit "1") and letter dated September 26, 2006 to Defendant from Scott J. Topolski, Esq.[1]  See Ex. 2 hereto.

3.      In accordance with 28 U.S.C. § 1446(a), attached to this Notice of Removal as Exhibit "1" are copies of all process, pleadings and orders served or filed in the State Court Action.

4.      In accordance with 28 U.S.C. § 1446(b), this Notice of Removal is filed with this Honorable Court within thirty days after the Defendant was served with a copy of the initial pleading setting forth the claim for relief upon which the State Court Action is based.  See Murphy Bros. Inc. v Michetti Pipe Stringing, Inc., 526 U.S. 344, 354 (1999).

5.      Defendant will give written notice of the filing of this Notice as required by 28 U.S.C. § 1446(d).

6.      A copy of this Notice will also be filed with the Clerk of the 15th Judicial District Court, Palm Beach County, Florida, as required by 28 U.S.C. § 1446(d).

7.      Defendant reserves all rights, including defenses and objections as to venue, personal jurisdiction, and service, and the filing of this notice of removal is subject to, and without waiver of, any such defenses and objections.

---

[1] In paragraph 69 of the Amended Complaint, Plaintiff asserts that a copy of the Topolski letter is attached to that pleading as Exhibit B.  In fact, the copy of the Amended Complaint served on Defendant contained no copy of that letter.  For the Court's convenience, however, Defendant has attached a copy of the letter to this Notice of Removal at Exhibit 2.

8.      Defendant reserves the right to amend or supplement this Notice of Removal.

Dated:  December 6th, 2006.           Respectfully submitted,

                                      _____
                                      GARY C. ROSEN (Florida Bar No. 310107)
                                      PATRICK P. DEGRAVELLES (Florida Bar No. 0014104)
                                      Becker & Poliakoff, P.A.
                                      3111 Stirling Road
                                      Fort Lauderdale, FL 33312
                                      (954) 987-7550, telephone
                                      (954) 985-4176, facsimile

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY a true and correct copy of the foregoing was furnished by US Mail

to:  BUCKINGHAM, DOOLITTLE & BURROUGHS, LLP, Scott J. Topolski, Esq., 5355 Town

Center Road, Suite 900, Boca Raton, Florida 33486 on this 6th day of December, 2006.

                                      _____
                                      PATRICK P. DEGRAVELLES

FTL_DB: 1016526_1

# EXHIBIT 1

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH, FLORIDA

CASE NO. 50 2006CA010109XXXXMB AD

ADVANCED BODYCARE SOLUTIONS,
LLC,

        Plaintiff,

v.

THIONE INTERNATIONAL, INC.,

        Defendant.

_____/

## CORPORATE SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and a copy of the amended complaint or petition in this action on defendant, **THIONE INTERNATIONAL, INC.** by serving its Registered Agent:

**Theodore Hersh**
**3201 Andrews Court N.W.**
**Atlanta, GA 30305**

Each defendant is required to serve written defenses to the complaint or petition on:  SCOTT TOPOLSKI, ESQ., plaintiff's attorney, whose address and phone number is:

        Buckingham, Doolittle & Burroughs, LLP
        P.O. Box 810155
        Boca Raton, Florida 33481-0155
        Telephone: 561-241-0414

within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on plaintiff's attorney or immediately thereafter.  If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

SHARON R. BOCK
Clerk & Comptroller
P.O. Box 4667
West Palm Beach, Florida
33402-4667

DATED ON _____NOV 0 9 2006_____, 2006.

CLERK OF THE CIRCUIT COURT

(SEAL)

BY:_____
      CHARLTON BOWONTHAMACHAKR
          Deputy Clerk

In accordance with the Americans with Disabilities Act, persons in need of a special accommodation to participate in this proceeding, shall, within a reasonable time prior to any proceeding, contact the ADA Coordinator at 201 S. E. 6th Street, Room 136, Ft. Lauderdale, FL 33301 or telephone voice/TDD (305) 357-6364 not later than five (5) business days prior to such proceeding.
«BOCA:127063_v1/58567-0006»

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH, FLORIDA

CASE NO. 50 2006CA010109XXXXMB AD

ADVANCED BODYCARE SOLUTIONS,
LLC,

       Plaintiff,

v.

THIONE INTERNATIONAL, INC.,

       Defendant.

_____/

COPY
RECEIVED FOR FILING

NOV 0 9 2006

SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

## AMENDED COMPLAINT

Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC, for its Complaint, alleges:

## PARTIES, JURISDICTION AND VENUE

1.    This is an action for declaratory relief and damages in excess of Fifteen Thousand ($15,000.00) Dollars, exclusive of interest, costs and attorney's fees.

2.    Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC ("Plaintiff" or "Advanced"), is a Delaware limited liability company, registered to do business in Florida and with its principal place of business in Palm Beach County, Florida.

3.    At all times material hereto and upon information and belief, Defendant, THIONE INTERNATIONAL, INC. ("Defendant" or "Thione"), is and was a Georgia corporation with its principal place of business in Atlanta, Georgia.

4.    Thione is subject to the jurisdiction of this Court, under Fla. Stat. § 48.193, by virtue of its:

    a.    having committed certain acts giving rise to the claim or claims stated herein within the state of Florida;

1

  b.  operating, conducting, engaging in or carrying on a business or business venture in Florida; and

  c.  engaging in substantial and not isolated activity in Florida.

 5. Venue is proper with this Court in that Thione, as a non-Florida corporation, can be sued in any county in Florida.

## FACTUAL ALLEGATIONS

 6. Advanced is engaged in the business of developing, distributing and marketing nutritional supplements, topicals and other related technologies throughout the world.

 7. Upon information and belief, Thione:

  a.  has developed a proprietary antioxidant complex known as the "Thione Antioxidant Complex" to reduce free radical damage to the body;

  b.  has developed a home test kit (the "Free Radical Monitor Test Kit") to monitor the body's free radicals;

  c.  is the owner of certain patents and trademarks related to the Thione Antioxidant Complex and Free Radical Test Kit; and

  d.  is engaged in the manufacture and distribution of the Thione Antioxidant Complex and Free Radical Test Kit.

 8. On or about April, 2004, Advanced and Thione entered into a Supply and Licensing Agreement (the "Agreement"). A copy of the Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

 9. Pursuant to the Agreement, Advanced agreed to purchase from Thione:

  a.  the Dietary Supplement, as defined in the Agreement, at a price specified in Exhibit A to the Agreement and pursuant to certain minimum order requirements as set forth in Exhibits

A-1, A-2, A-3 and A-4 to the Agreement; and

   b.   the Test Kit, as also defined in the Agreement, pursuant to the prices and minimum order requirements set forth in Exhibits B-1 and B-2 to the Agreement.

10.   The Dietary Supplements and Test Kits purchased by Advanced from Thione were to be shipped to such locations as directed by Advanced.

11.   Pursuant to Paragraph 3A of the Agreement, Advanced was provided with what was an exclusive license to "advertise, promote, market, sell and otherwise distribute the tableted Dietary Supplement for the purposes of anti-aging, repletion of endogenous antioxidant stores and/or immune system boosting" in North America.

12.   Similarly, pursuant to Paragraph 3B of the Agreement, Advanced was provided with the "authority to assemble the individual Components into a Test Kit" and what was an exclusive license to "advertise, promote, market, sell and otherwise distribute the Test Kit" in North America.

13.   Paragraph 6B of the Agreement provides:

Termination Upon Breach. Either party may terminate this Agreement upon thirty (30) days written notice thereof to the other party upon the breach by the other party of any of its material representations, warranties, covenants, or agreements contained in this Agreement. Upon the expiration of such notice period, this Agreement shall terminate without the need for further action by either party; provided, however, that if the breach upon which such notice of termination is based shall have been fully cured to the reasonable satisfaction of the terminating party within such 30-day period, then such notice of termination shall be deemed rescinded, and this Agreement shall be deemed reinstated and in full force and effect. Such right of termination shall be in addition to such other rights and remedies as the terminating party may have under applicable law.

14.   Paragraph 5 of the Agreement provides:

Early Termination By Thione. Without affecting or limiting any other rights which Thione may have hereunder at law or in equity, Thione shall have the right, upon thirty (30) days prior written notice to [Advanced], to terminate the Agreement upon the occurrence of any of the following events:

   1.   Failure of [Advanced] to make the minimum payments herein after thirty (30) days prior written notice of such failure to pay has been provided in accordance with Section 6 and an opportunity to cure the same; or

3

2.    The breach by [Advanced] of the exclusivity or territorial limitations contained in this Agreement; or

3.    The breach by [Advanced] of any warranty, obligation, covenant or agreement under this Agreement except as otherwise provided herein.

15.    Under Paragraph 5D of the Agreement, once the Agreement was terminated, "all the terms and obligations provided for in this Agreement shall remain in effect up to the expiration of any applicable termination notice period, if any."

16.    On or about May 26, 2004, Advanced ordered 25,000 Test Kits and wired the sum of $41,250.00 to Thione's bank account. These Test Kits were shipped to Advanced's warehouse in Orlando and arrived there on or about September 1, 2004.

17.    On or about June 28, 2004, Advanced placed an Order for the Dietary Supplements and wired the sum of $15,300.00 to Thione's bank account. The Dietary Supplements purchased pursuant to this Order were shipped to Advanced's manufacturer, Garden State Nutritionals.

18.    The purchase orders described in Paragraphs 16 and 17 above satisfied Advanced's purchase obligations under the Agreement through the third calendar quarter of 2004.

19.    Unfortunately, the first shipment of ampoules, which were part of the Test Kits, included numerous broken ampoules and contained over 1,000 unbroken ampoules with a strange pinkish color, suggesting that the liquid had oxidized. Advanced immediately contacted Thione's representative, Mark Hersh, who instructed Advanced to collect and retain the evidence in order to file a claim with the shipping company.

20.    Throughout the middle and latter part of 2004, Advanced worked diligently with Thione in connection with a marketing plan/program, including script development and related preparations for a television commercial, to market the Dietary Supplements and Test Kits.

21.    Because of Thione's protracted review, revision and editing of the marketing plan/

4

program and related documents and despite Advanced's diligent efforts, a marketing plan/program, including the script for the aforementioned television commercial, was not finalized until approximately December of 2004.

22.     In light of the delays associated with Thione's review, revision and editing of the marketing plan/program and related documents, the need to test the marketing plan/program and the defects in the ampoules previously shipped to Advanced, Advanced advised Thione that it could not commit to the purchase order threshold, as set forth in the Agreement, for the fourth quarter of 2004.

23.     In late December 2004, Advanced discovered that more of the ampoule inventory was turning the strange pinkish color. Advanced immediately notified Thione of the issue and sent via overnight delivery service a box of the defective ampoules.

24.     In light of Advanced's reluctance to commit to the purchase order threshold which would maintain Advanced's exclusivity for the fourth quarter of 2004 as set forth in the Agreement and despite the delay in launching the advertising campaign and the new discovered problem with a key component of the Test Kit and Thione's apparent need for the funds associated with that purchase order threshold, Advanced and Thione agreed, in or about late December of 2004, on what was, in effect, a compromise, namely Advanced agreed to make a good faith deposit of $72,450.00 on a future purchase order, with the specific quantity of components to be specified in the very near future.

25.     Accordingly, Advanced wired the sum of $72,450.00 to Thione's bank account on or about January 7, 2005.

26.     Several weeks later, on or about January 25, 2005, Thione's counsel, Wendy Barkin, sent an email to Advanced's counsel, Beth Geller (the "Barkin email"), indicating that Thione was concerned about a possible "breach" of the contract because of Advanced's alleged failure to order more Dietary Supplements and Test Kits from Thione but without terminating or attempting to terminate the Agreement

5

and without referring to any particular contractual provision relating to termination.

27.    Under Paragraph 16 of the Agreement, any termination notice was required to be in writing and forwarded to the other party by certified mail or a recognized over-night carrier.

28.    There were no further written or oral communications from Thione to Advanced, through the remainder of 2005, suggesting that Advanced had potentially breached the Agreement and, in fact, the parties continued to communicate and interact with each other in a manner consistent with an ongoing business relationship and an agreement in full force and effect. To that end and in connection with its efforts to market the Dietary Supplements and Test Kits, Advanced, with the full knowledge, consent and acquiescence of Thione, retained a retail distributor, made a commitment to have a direct mail piece written featuring the product and was actively working on an absorption study.

29.    Despite Thione's denial of a problem with the ampoules, by February of 2005, Advanced learned that approximately 20 percent of the original ampoules shipped by Thione were defective.

30.    In the months succeeding February, 2005, Advanced and Thione exchanged numerous emails regarding the defective nature of the ampoules and potential reasons why the ampoules were defective.

31.    In April of 2005, Thione finally acknowledged the manufacturing defects in the ampoules, which amounted to 50 percent of the ampoules originally received by Advanced in 2004. Thione committed to replacing the defective ampoules.

32.    In October of 2005, Thione shipped 6,734 new ampoules to Advanced's warehouse in Orlando, leaving approximately 6,000 defective ampoules that have never been replaced.

33.    In August of 2006, Thione advised Advanced that it considered the Barkin email to be formal notification of termination of the Agreement, despite the fact that throughout 2005 and 2006, up until August of 2006, Thione retained a deposit for additional product and communicated and transacted

with Advanced in a manner consistent with an ongoing business relationship and an agreement in full force and effect.

34.     All conditions precedent to bringing this action have been performed, have occurred or have been waived.

35.     Advanced has retained the undersigned attorneys and is obligated to pay them reasonable attorney's fees for their services.

## COUNT I - BREACH OF CONTRACT

36.     Advanced repeats and realleges the allegations contained in Paragraphs 1 through 35 of this Complaint as if set forth herein at length.

37.     Thione's purported termination of Advanced was a violation and breach by Thione of the specific terms of Paragraph 5 of the Agreement.

38.     Thione further breached the Agreement by supplying defective ampoules to Advanced.

39.     Advanced has suffered damages as a result of Thione's breach of the Agreement.

40.     Advanced has fully performed its obligations under the Agreement or full performance has been excused.

WHEREFORE, Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC, respectfully requests that this Court enter judgment against Defendant, THIONE INTERNATIONAL, INC., for damages, together with interest, attorneys' fees, the costs of this action and such other and further relief that this Court deems just and equitable.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

41.     Advanced repeats and realleges the allegations contained in Paragraphs 1 through 35 of this Complaint as if set forth herein at length.

42.     Implied in the Agreement is a mutual covenant of good faith and fair dealing, i.e., both

Thione and Advanced agreed to act in good faith and deal with each other fairly and to refrain from engaging in any acts which violated the covenant of good faith and fair dealing.

43.     Advanced expended substantial time and money in dutifully performing its obligations pursuant to the Agreement and in reliance upon Thione's outward actions and statements which were consistent with an ongoing business relationship and an agreement in full force and effect.

44.     Thione's actions in:  a.)  advising Advanced, via the Barkin email, about a potential breach of the Agreement but without terminating or attempting to terminate the Agreement and choosing to do nothing else; b.) never subsequently terminating or attempting to terminate the Agreement; c.) retaining a deposit for product; d.) communicating and transacting with Advanced in a manner consistent with an ongoing business relationship and an agreement in full force and effect; and e.) waiting until August of 2006, after Advanced had already expended substantial time and money in performing its obligation under the Agreement, to advise Advanced that it considered the Agreement terminated, constitute a breach of the implied covenant of good faith and fair dealing.

45.     Advanced has suffered damages as a result of Thione's breach of the implied covenant of good faith and fair dealing.

WHEREFORE, Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC, respectfully requests that this Court enter judgment against Defendant, THIONE INTERNATIONAL, INC., for damages, together with interest, attorneys' fees, the costs of this action and such other and further relief that this Court deems just and equitable.

## COUNT III - DECLARATORY RELIEF

46.     Advanced repeats and realleges the allegations contained in Paragraphs 1 through 35 of this Complaint as if set forth herein at length.

47.     Pursuant to Paragraph 5A of the Agreement, upon termination of the Agreement,

Advanced has "a period of six (6) months to sell-off remaining inventory levels of Products."

48.     Advanced currently maintains certain inventory levels of the Test Kits and Dietary Supplements in its warehouse in Orlando.

49.     Because of Thione's now apparent reliance on the Barkin email in support of the purported termination of the Agreement, Advanced is unsure of its rights with regard to the sale of remaining inventory levels of Dietary Supplements and Test Kits.

50.     There is a bona fide, actual, present, practical need for the declaration of Advanced's rights under the Agreement.

51.     All of the parties who have, or reasonably may have an actual, present, adverse and antagonistic interest in the subject matter have been joined in this lawsuit.

52.     The relief sought herein is not merely to give legal advice or answer questions propounded by curiosity.

53.     Advanced has no adequate remedy at law.

WHEREFORE, Plaintiff, ADVANCED BODYCARE SOLUTIONS, requests that this Court enter Judgment declaring:

a.     Advanced's rights with regarding to the sale of any inventory of Test Kits and Dietary Supplements currently located in Advanced's warehouse;

b.     Advanced is entitled to an award of attorney's fees and costs; and

c.     such other and further relief as the Court deems just and proper.

## COUNT IV - CONVERSION

54.     Advanced repeats and realleges the allegations contained in Paragraphs 1 through 35 of this Complaint as if set forth herein at length.

9

55.    Beginning on or about January 7, 2005, Thione converted to its own use the sum of $74,450.00 belonging to Advanced and has specifically advised Advanced that it no longer has or possesses said funds.

56.    Advanced has suffered damages as a result of Thione's above-described acts of conversion.

57.    Pursuant to § 768.72, Fla. Stat., Advanced reserves the right to amend this Complaint to assert a claim for punitive damages upon demonstrating a reasonable basis for recovery of such punitive damages by a reasonable showing by evidence in the record or otherwise proffered by Advanced.

WHEREFORE, Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC, respectfully requests that this Court enter judgment against Defendant, THIONE INTERNATIONAL, INC., for damages, together with interest, the costs of this action and such other and further relief that this Court deems just and equitable.

## COUNT V – BREACH OF IMPLIED WARRANTY

58.    Advanced repeats and realleges the allegations contained in Paragraphs 1 through 35 of this Complaint as if set forth herein at length.

59.    Thione impliedly warranted that the goods it was manufacturing and supplying to Advanced were of good quality and free from defects and faults.

60.    The goods manufactured and supplied by Thione to Advanced, more particularly, the ampoules, were not of good quality and were not free from defects and faults.

61.    Thione breached its implied warranty to Advanced by manufacturing and supplying ampoules that were not of good quality and that were not free from defects and faults.

62.    The ampoules manufactured and supplied by Thione to Advanced were defective when they were transferred from Thione to Advanced.

63.     Advanced has informed Thione that the ampoules do not conform to the Agreement.

64.     As a result of Thione's actions, Advanced has suffered damages.

WHEREFORE, Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC, respectfully requests that this Court enter judgment against Defendant, THIONE INTERNATIONAL, INC., for damages, together with interest, the costs of this action and such other and further relief that this Court deems just and equitable.

## COUNT VI—CIVIL THEFT

65.     Plaintiff realleges and reaffirms the allegations of Paragraphs 1 through 35 as if fully set forth herein.

66.     Beginning on or about January 7, 2005, Thione converted to its own use the sum of $74,450.00 belonging to Advanced and has specifically advised Advanced that it no longer has or possesses said funds.

67.     Thione  knowingly obtained and used the money of Advanced with felonious intent to, either temporarily or permanently, deprive Advanced of the right to the money and appropriate the money to Defendants' own use in violation of Sec. 812.014(1) Florida Statutes.

68.     As a result, Advanced has been injured because of the violation of Sec. 812.014(1) Florida Statutes and has lost at least $74,450.00  plus interest from the date the money was wrongfully taken.

69.     Before filing this action, Advanced  made written demand (the "demand") upon Thione , a copy of which is attached hereto as Exhibit "B" and incorporated herein by reference, for three times the amount of money taken by Thione from Advanced.

70.     Thione has not replied to the demand.

WHEREFORE, Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC, respectfully requests that this Court enter judgment against Defendant, THIONE INTERNATIONAL, INC., for treble damages, plus attorneys' fees, interest, costs and such other and further relief as this Court may deem just and proper.

Dated this _7th_ day of November, 2006.

> BUCKINGHAM, DOOLITTLE & BURROUGHS, LLP
> Attorneys for Plaintiff, Advanced BodyCare Solutions, LLC
> 5355 Town Center Road, Suite 900
> Boca Raton, Florida 33486
> Telephone: 561 241-0414
> Facsimile:  561 241-9766
>
> By _____  #177652
>        Scott J. Topolski              for
>        Florida Bar No. 0006394

«BOCA:125264_v1»

12

# EXHIBIT A

## SUPPLY AND LICENSING AGREEMENT

THIS SUPPLY AND LICENSING AGREEMENT ("Agreement") is entered as of this 1st day of April, 2004 by and between Thione International, Inc., a Georgia corporation ("Thione" or "Licensor") and Advanced BodyCare Solutions, LLC, a Delaware limited liability company ("ABCS" or "Licensee").

## W I T N E S S E T H:

WHEREAS, Thione has developed a proprietary antioxidant complex known as the "Thione Antioxidant Complex™," useful for reducing free radical damage to the body as described in its United States Patent #5,922,346; and

WHEREAS, Thione has developed a test kit for use in the home for the purpose of monitoring the body's free radicals ("Free Radical Monitor Test Kit"); and

WHEREAS, as a result of the expenditure of time, effort and money, Thione is the owner of certain patents, trademarks, methods and trade secrets relating to the Thione Antioxidant Complex™ and Free Radical Monitor Test Kit; and

WHEREAS, Thione is also engaged in the manufacture and distribution of the Thione Antioxidant Complex™ and the Free Radical Monitor Test Kit; and

WHEREAS, Licensee is engaged in the development, distribution and marketing of nutritional supplements, topicals and other technologies worldwide; and

WHEREAS, the parties contemplate Licensee marketing and distributing the Free Radical Monitor Test Kit and the Thione Antioxidant Complex™ in the territory (as defined in Section 1 below) via the distribution channels outlined in Section 3 below.

NOW, THEREFORE, in consideration of mutual covenants and promises herein contained, the parties agree as follows:

1. **DEFINITIONS.** For purposes of this Agreement, the following definitions shall apply:

   A.   "**Dietary Supplement.**" The term "Dietary Supplement" shall mean the Thione Antioxidant Complex™ in a formulation that is: (1) composed of more than 49 mg. of L-Glutathione (reduced) per serving, N-Acetyl-L-Cysteine and L-Selenomethionine. The specific formulas for the Dietary Supplement governed by this Agreement are attached hereto as Exhibits A-1, A-2, A-3 and A-4 and by this reference incorporated herein.

   B.   "**Product**" or "**Products.**" The term "Product" or "Products" shall mean the Dietary Supplement or the Test Kit, individually or collectively, as applicable.

   C.   "**Territory.**" The term "Territory" shall mean the United States of America.

D.  **"Test Kit."** The term "Test Kit" shall mean the Free Radical Monitor Test Kit which may consist of either: (1) an entire kit which includes two (2) complete home test kits ("Whole Test Kit"); or (2) solely the test kit components which may consist of of the ampoule, pipette and breaker, individually, or any combination thereof (hereinafter the "Components"). The Test Kit and the Components are more particularly described in Exhibits B-1 and B-2, attached hereto and by this reference incorporated herein.

2.  **SUPPLY OF PRODUCTS.** Subject to the terms and conditions incorporated herein, Thione agrees to use commercially reasonable efforts to supply and sell to Licensee and Licensee agrees to purchase from Thione the following Products:

A.  **Dietary Supplement.** Thione shall supply to Licensee or its designee the Dietary Supplement in the form of unmixed, bulk powder in one or more of the formulations specified in Exhibit A. The price per kilogram for the Dietary Supplement is set forth in Exhibit A. The minimum order of the Dietary Supplement is 50 kilos for Exhibits A-1 and A-2 and 25 kilos for Exhibits A-3 and A-4 and the lead time is eight (8) weeks from receipt of a purchase order. Licensee shall thereafter be solely responsible, at its cost, for the further processing, mixing and packaging of the raw material into a consumable chewable/dissolvable tablet for buccal absorption. It will be the sole responsibility of Licensee to manufacture the tablet, to obtain bottles and to fill and label such bottles at its own expense. Licensee shall also be responsible, at its cost, for complying with any regulations, rules, laws, ordinances or other requirements respecting the storage, handling, marketing, promoting, sale and distribution of the Dietary Supplement.

B.  **Test Kit.** At Licensee's direction, Thione shall supply to Licensee the Test Kit either as a Whole Kit or solely as Components. The minimum order requirements, prices and set-up fees for plates, film proof and dies for the Whole Test Kit are set forth in Exhibit B-1. The minimum order requirements and prices for the Components are set forth in Exhibit B-2. The lead time is typically twelve (12) weeks from the receipt of a purchase order, but is 12 weeks from approval of graphics following receipt of a purchase order if the Whole Test Kits are for private labeling. Licensee shall also be responsible, at its cost, for complying with any regulations, rules, laws, ordinances or other requirements respecting the storage, handling, marketing, promoting, sale and distribution of the Whole Kit or the Components.

C.  **Shipping and Additional Expenses.** The Products shall be shipped to such location(s) as specified by Licensee in its purchase orders that are issued and directed to Thione from time-to-time. For each order, Licensee shall also pay:

(1) All costs and expenses of shipping the Products from the following designated facilities to such location(s) specified by Licensee (including any taxes, insurance and other charges as levied by the shipper):

(a) **Whole Test Kit:** F.O.B. Plant in New Jersey

(b) **Components:** F.O.B. Thione's Atlanta Warehouse

(c) **Dietary Supplement:** F.O.B. Plant for each individual ingredient

(2)  Sales taxes, if any, levied in connection with the sale of the Product from Thione to Licensee.

2

D.    **Price Increases.** The prices stated in Exhibits A and B shall remain in effect for a period of six (6) months from the date of this Agreement. Thereafter, within thirty (30) days prior to the beginning of each quarter, Thione will quote to Licensee the prices and other terms and conditions that will be applicable for the succeeding quarter. Notwithstanding the foregoing, if at any time, Thione experiences, in the aggregate, a ten percent (10%) or more increase in its labor or material costs for either or both of the Products, the prices hereunder will increase in a corresponding amount; provided however, that Thione shall use commercial reasonable efforts to find a lower cost source for such labor and/or material within thirty (30) days of its receipt of such notice of its price increase.

3.   **LICENSE.**

A.    **Dietary Supplement.** Except as provided below, subject to the terms and conditions set forth herein and without rights to sub-license, Thione hereby grants to Licensee, during the Term (as defined in Section 5 hereunder), the license and authority to manufacture a chewable/suckable tablet incorporating the Dietary Supplement and to advertise, promote, market, sell and otherwise distribute the tableted Dietary Supplement for the purposes of anti-aging, repletion of endogenous antioxidant stores, and/or immune system boosting in the Territory on an exclusive basis by such means and media as ABCS may determine, in the following channels of distribution: (i) airings of a commercial on broadcast, cable, satellite and all other forms of television transmission now existing or hereafter developed, (ii) television shopping programs such as those aired by QVC and Home Shopping Network ("Television Home Shopping Shows"), (iii) radio, (iv) print media, (v) direct-mail solicitation, (vi) package inserts, (vii) inbound and outbound telemarketing, (viii) credit card syndication, (ix) catalogues, (x) wholesale and retail channels; and (xi) computer transmissions such as commercial on-line services and the Internet.

(1)    Notwithstanding anything to the contrary above or elsewhere herein, Thione retains the right to, and nothing contained in this Agreement shall limit or affect Thione's right to, manufacture, advertise, promote, market, sell and/or license others to the rights to manufacture, advertise, promote, market, sell or otherwise distribute: (a) the Dietary Supplement outside the Territory by any means or method whatsoever or, within the Territory, through distribution channels other than as stated in Section 1.A.(i) through (xi) above, including, but not limited to professional markets, multi-level marketers and the government; and (b) the Thione Antioxidant Complex™ for all other applications except as specifically described herein, including without limitation, skin care, oral care, oral cosmeceutical applications or as an addition to other dietary supplements or OTC products.

(2)    Licensee acknowledges that it is not acquiring the right to, and covenants and agrees that it will not, and will not authorize or permit others to, advertise, promote, market, sell or otherwise distribute the Dietary Supplement (tableted or otherwise) (a) outside the Territory or (b) within the Territory, through any distribution channel other than as stated in Section 1.A. (i) through (xi) above without the express written consent of Thione.

(3)    Licensee expressly acknowledges that it is not acquiring the right to, and covenants and agrees not to manufacture the Dietary Supplement itself.

3

B. **Test Kit.** Except as provided below, subject to the terms and conditions set forth below and without rights to sub-license, Thione hereby grants to Licensee, during the Term, the license and authority to assemble the individual Components into a Test Kit, and to advertise, promote, market, sell and otherwise distribute the Test Kit in the Territory through the Section 1.A. (i) through (xi) channels of distribution on an exclusive basis.

(1)     Notwithstanding anything to the contrary above or elsewhere herein, Thione retains the right to, and nothing contained in this Agreement shall limit or affect Thione's right to, manufacture, advertise, promote, market, sell and/or license others to the rights to manufacture, advertise, promote, market, sell or otherwise distribute the Test Kit outside the Territory by any means or method whatsoever or, within the Territory, through distribution channels other than as stated in Section 1.A.(i) through (xi) above, including, but not limited to professional markets, multi-level marketers and the government.

(2)     Licensee acknowledges that it is not acquiring the right to, and covenants and agrees that it will not, and will not authorize or permit others to, advertise, promote, market, sell or otherwise distribute the Test Kit (a) outside the Territory or (b) within the Territory, through any distribution channel other than as stated in Section 1.A. (i) through (xi) above without the express written consent of Thione.

(3)     Licensee expressly acknowledges that it is not acquiring the right to, and covenants and agrees not to manufacture the ampoules component of the Test Kit or the Test Kit itself.

C. **Grandfathered Accounts.** Notwithstanding the foregoing exclusive rights, and in addition to the rights retained by Thione, Licensee agrees to allow Thione to continue to sell the preparations listed in Exhibit C, attached hereto and by this reference incorporated herein, as an oral product with the Thione Complex™, but not for further distribution to other than end use consumers.

D. **Cooperation.** Thione agrees to share with Licensee Thione's technology to produce a tablet for the Dietary Supplement and will share with Licensee any improvements to the Dietary Supplement and the Test Kit that may be applicable hereunder which shall be cross licensed to the parties hereto, but owned by Thione in accordance with Section 13(B).

E.   **Product Groupings.**  Thione acknowledges that Licensee shall have the right to develop such groupings and ensembles of the Products and other ancillary goods for sale as Licensee may determine.

F.   **Distributors and Subdistributors.**   Licensee may appoint such distributors and subdistributors as it may deem appropriate in order to market and distribute the Products pursuant to written agreements previously approved in writing by Thione, such approval not to be unreasonably withheld. Such agreements must, among other things, provide that Licensee's subdistributors are subject to all of the obligations imposed upon Licensee under this Agreement and that the rights of the subdistributor will terminate immediately upon the termination of this Agreement.

4

## 4. MARKETING.

A.      Licensee shall use commercially reasonable efforts to actively advertise, promote, supply and market the Products during the Term of this Agreement, all in accordance with the terms and conditions of this Agreement.

B.      Licensee shall include the Thione Complex™ brand mark on all printed marketing, advertising and promotional materials including, but not limited to, labeling, packaging and collateral materials. The Thione Antioxidant Complex™ brand logo specifications are attached hereto as Exhibit D and by this reference incorporated herein.

C.      Specimens of all proposed labeling, packaging, promotional, advertising, and any and all other collateral materials Licensee intends to use in connection with the advertising, promoting, marketing, sale and distribution of the Products must be forwarded by Licensee to Thione for prior approval, which approval shall not be unreasonably withheld or delayed. Thione shall have ten business (10) days from receipt of such specimen materials to comment, approve or disapprove of such proposed materials and the failure by Thione to respond within the above period without good reason shall be considered acceptance by Thione of the proposed materials. Notwithstanding the approval process described above, Licensee shall be solely responsible for ensuring compliance with any advertising or similar governmental regulations applicable to such materials and Thione shall have no liability whatsoever to Licensee, any government agency or other third party resulting from Licensee's failure to comply with any such regulations.

D.      As evidence of its marketing activities, Licensee shall provide Thione, from time to time, with copies of the advertisements, catalogues, and other promotional materials of the Products it utilizes.

E.      Dr. Hersh will be available to Licensee, on a reasonable basis, to support the market position of the Products. Upon prior written notice and subject to his other professional and personal commitments, his services may include speaking engagements, radio, print and television interviews and quotes for use in literature, however, under no circumstances whatsoever shall Dr. Hersh's name, likeness or opinions be used or expressed in any manner without his express written consent. Licensee shall be responsible for travel expenses for Dr. Hersh and accompanying associate (Dr. Hersh is legally blind and requires assistance), together with an accommodation allowance of $250.00 per diem and a food allowance of $200.00 per diem. Notwithstanding the foregoing, if, in the sole opinion of Dr. Hersh, the activities hereunder are encroaching on his ability to allocate sufficient time to his other professional commitments, Dr. Hersh shall be entitled to receive a reasonable consultant fee for his services.

## 5.   TERM AND TERMINATION.

A.      This Agreement, unless terminated earlier as provided herein, shall remain in full force and effect from April 1, 2004 to March 31, 2009. Upon the expiration of such term, this Agreement shall automatically be extended for additional one-year periods unless either party provides sixty (60) days prior written notice of termination to the other party. If this Agreement is not renewed, all rights to advertise, promote, market, sell or otherwise distribute the Products shall end and Licensee shall immediately cease further marketing or sale of the Products. Notwithstanding the

foregoing, upon termination hereunder, Licensee shall have a period of six (6) months to sell-off remaining inventory levels of Products.

B.     Termination Upon Breach.  Either party may terminate this Agreement upon thirty (30) days written notice thereof to the other party upon the breach by the other party of any of its material representations, warranties, covenants, or agreements contained in this Agreement.  Upon the expiration of such notice period, this Agreement shall terminate without the need for further action by either party; provided, however, that if the breach upon which such notice of termination is based shall have been fully cured to the reasonable satisfaction of the terminating party within such 30-day period, then such notice of termination shall be deemed rescinded, and this Agreement shall be deemed reinstated and in full force and effect.  Such right of termination shall be in addition to such other rights and remedies as the terminating party may have under applicable law.

C.     **Early Termination By Thione.**  Without affecting or limiting any other rights which Thione may have hereunder at law or in equity, Thione shall have the right, upon thirty (30) days prior written notice to Licensee, to terminate this Agreement upon the occurrence of any of the following events:

1.     Failure of Licensee to make the minimum payments herein  after thirty (30) days prior written notice of such failure to pay has been provided in accordance with Section 6 and an opportunity to cure the same; or

2.     The breach by Licensee of the exclusivity or territorial limitations contained in this Agreement; or

3.     The breach by Licensee of any warranty, obligation, covenant or agreement under this Agreement except as otherwise provided herein.

D.     Upon expiration or termination of this Agreement, all the terms and obligations provided for in this Agreement shall remain in effect up to the expiration of any applicable termination notice period, if any.

6.   ANNUAL MINIMUM PURCHASE REQUIREMENTS.

A.     **Annual Minimum Purchase Requirements.**  Subject to the minimum order requirements set forth in Section 2.A. and Exhibits B-1 and B-2, Licensee shall order the Products, in any combination thereof, at its discretion in at least the minimum United States Dollar ($) amounts according to the schedule below.  All orders for Products received prior to December 31, 2004 shall be applied to the 4th Quarter 2004 minimums.

| | 1st Quarter Jan. 1st - Mar. 31st | 2nd Quarter April 1st – June 30th | 3rd Quarter July 1st – Sept. 30th | 4th Quarter Oct. 1st - Dec. 31st |
|---|---|---|---|---|
| 2004 | XX | XX | XX | $201,450.00 |
| 2005 | $268,600.00 | $335,750.00 | $537,200.00 | $537,200.00 |
| 2006 | $537,200.00 | $537,200.00 | $537,200.00 | $537,200.00 |
| 2007 | $537,200.00 | $550,000.00 | $550,000.00 | $550,000.00 |
| 2008 | $550,000.00 | $550,000.00 | $555,000.00 | $555,000.00 |
| 2009 | $555,000.00 | | | |

In the event the term of this Agreement is extended as provided for in Section 5.A. above, the parties agree to negotiate new annual minimum purchase requirements for such new term within thirty (30) days prior to expiration of the current term, but in no event shall such new annual minimum purchase requirements be less than one hundred ten percent (110%) than those in effect at the end of the current term.

B.    **Effects of Deficiencies.** If Licensee fails to order and pay for at least the minimum dollar amount of Products during any applicable period of time, this Agreement and the exclusive license granted to Licensee in Section 3 above shall, as of such date, at the sole and absolute discretion of Thione: (1) be terminated; (2) be re-negotiated with respect to price, duration or similar aspect; or (3) be changed from an "exclusive" license to a "non-exclusive" license for the balance of the term of this Agreement (subject to all other terms, conditions and limitations of this Agreement). Notwithstanding the foregoing, prior to exercising any of the afore-mentioned rights, Thione shall provide Licensee with thirty (30) days prior written notice to remedy any purchase deficiency and if Licensee cures such minimum dollar order shortfall within such 30 day period, the exclusive license shall remain intact.

7.    **PAYMENTS AND PURCHASE ORDERS.** Subject to any other terms and conditions contained herein, all purchase orders must meet the minimum order requirements set forth in Section 2 and/or Exhibits B-1 and B-2.

A.    **Time for Payment.** Except as provided in paragraph B below, Thione grants Licensee the following payment terms:

(1) Initial order – payment in full with purchase order;
(2) All subsequent orders – 50% of the purchase order amount due with the purchase order and 50% Net 30 from Licensee's receipt of all purchased Products;
(3) Notwithstanding the foregoing payment terms, as the initial roll-out of the Products increases, Thione agrees to negotiate with its suppliers for better payment terms such as "Net 30 days" and agrees that when it is successful in attaining better terms for itself, it shall pass on such terms to Licensee and this Agreement shall be so modified.

B.    **Initial Purchase.** Licensee shall place an initial purchase order for Products with Thione no later than thirty (30) days after the execution of this Agreement in order to initiate this contractual relationship with any such purchases or dollar amounts to be applied to Licensee's 2004 minimum purchase and payment requirements in accordance with the terms hereunder.

7

8.    RANDOM TESTING. Licensee warrants that the finished product that incorporates the Dietary Supplement shall contain the quantity and purity of the Thione Complex™ described in Exhibit A. Thione has the right to do random HPLC testing on any production lot of such finished "Dietary Supplement" product to verify composition quantity and purity.

9.    INDEMNIFICATION.

A.    **Indemnification of Thione.**   Licensee shall indemnify, defend and hold harmless Thione, its members, managers, employees, officers, directors, shareholders, attorneys and agents and the harmless from all claims, demands, causes of action, suits, proceedings, damages, costs, expenses and the like, arising from or related to: (1) the storage, handling, promoting, marketing, advertising, sale or distribution of the Products, or the manufacture and conversion of bulk Product to packaged Product pursuant to this Agreement; and (2) the breach by Licensee of any of its warranties, covenants, obligations, agreements or duties under this Agreement. This obligation of indemnification shall survive termination of this Agreement. Licensee shall maintain a policy of insurance, naming Thione as an additional insured, covering any liability or claims arising from the foregoing. The insurance shall have limits of not less than Two Million Dollars ($2,000,000.00). Upon request, Licensee shall deliver to Thione a Certificate of Insurance evidencing such insurance.

B.    **Indemnification of Licensee.**   Thione shall indemnify, defend and hold harmless Licensee, its members, managers, employees, attorneys and agents harmless from any claims, demands, causes of action, suits, proceedings, damages, costs, expenses and the like, arising from or related to the design, manufacture, use and/or consumption (by end-users or otherwise) of the Products provided to Licensee pursuant to this Agreement unless attributable to the acts or omissions of Licensee. In addition, Thione will obtain a policy of insurance, naming Licensee as an additional insured, covering any liability or claims arising from the foregoing.

C.    **Indemnification Procedures.**   In the event that any legal proceeding is instituted or any claim or demand is asserted by any third party which may give rise to any damage, liability, loss or cost or expense in respect of which either party has indemnified the other party under this Agreement, the indemnified party shall give the indemnifying party written notice of the institution of such proceedings or the assertion of such claim or demand, promptly after the indemnified party first becomes aware thereof; provided, that the failure of the indemnified party to promptly give notice of any such proceeding, claim or demand to the indemnifying party shall not relieve the indemnifying party of its indemnification obligations hereunder except to the extent that such failure actually and materially prejudices the rights of the indemnifying party. The indemnifying party shall have sole control over the defense and/or settlement of any such proceeding, claim or demand; provided, that (i) the indemnified party may participate in any such proceeding with counsel of its choice at its own expense, and (ii) the indemnifying party shall not, without the written consent of the indemnified party, consent to the entry of any judgment or enter into any settlement that provides for any injunctive or other nonmonetary relief affecting the indemnified party or that does not include as an unconditional term thereof the giving by the claimant or plaintiff to the indemnified party of a release from all liability with respect to such proceeding, claim or demand. In the event that the indemnifying party does not accept the defense of any matter as above provided, or counsel for the indemnified party advises the indemnified party that there are issues which raise conflicts of interest between the indemnifying party and the indemnified party, the indemnified party may retain counsel satisfactory to it, and the indemnifying party shall pay all reasonable fees and expenses of such counsel for the indemnified party promptly as statements therefor are received; provided, that the indemnifying party shall not be liable for any settlement effected without i  prior written consent (which consent shall not be unreasonably withheld or delayed). Each of the parties agrees to cooperate fully with each other in connection with the defense, negotiation or settlement

8

of any such proceeding, claim or demand and to provide all reasonably available information to the indemnifying party upon its reasonable request. The provisions of this Section shall survive the termination of this Agreement.

D. **Other Remedies**. The indemnification provided under this Section is in addition to all other available remedies at law or in equity for breach of any provision of this Agreement.

10. **WARRANTY**.

A. **Title**. Thione warrants that it is the exclusive owner of all right, title and interest in and to all Products to be sold to Licensee, free and clear of all security interests, encumbrances, liens or charges of any kind.

B. **Regulatory Requirements**.

1. **Thione**. Thione represents and warrants that, as of the date hereof, to the best of its knowledge, (i) it has obtained all material governmental and regulatory approvals, licenses, permits and consents which are required by it to market and distribute the Products within the Territory, (ii) the Products are not prohibited or otherwise restricted from being introduced or delivered by it for introduction or shipment in commerce within the Territory, and (iii) the Product otherwise materially complies with all applicable laws, rules, regulations and other regulatory requirements within the Territory, including, without limitation, those relating to product safety and environmental protection. In the event that any modification to the Products' labeling, packaging or instructions is or becomes necessary in order for the Products lawfully to be sold in the Territory, Licensee shall cause such modification to be made at its sole cost. In the event that any modification to the Products' design or formulation is or becomes necessary in order for the Products lawfully to be sold in the Territory, Thione shall evaluate whether a modification can feasibly be made both from a design and cost perspective, however, Thione shall have no obligation hereunder to perform a modification to the Products. If no such modification is made and the Product(s) can no longer be lawfully sold in the Territory, this Agreement shall terminate with respect to such Product(s).

2. **Licensee**. Licensee represents and warrants that, as of the date hereof, to the best of its knowledge, (i) it has obtained all material governmental and regulatory approvals, licenses, permits and consents which are required by it to manufacture, store, handle, promote, advertise, market, sell and distribute the Products within the Territory, (ii) the Products shall not be prohibited or otherwise restricted from being introduced or delivered by it for introduction or shipment in commerce within the Territory, and (iii) the Products shall otherwise materially comply with all applicable laws, rules, regulations and other regulatory requirements within the Territory, including, without limitation, those relating to product safety and environmental protection. Upon written notification to Licensee that Thione has entered into an exclusive supply, distribution and/or licensing arrangement for the Products for another territory, Licensee agrees that following receipt of such notice, it will no longer sell Products to customers within such other territory without the express written consent of Thione.

9

C. **Proprietary Rights**. As of this date, to the best of its knowledge, Thione represents, warrants and covenants to Licensee as follows:

(1) No Infringement. Neither the granting of the rights and privileges granted hereunder nor the exercise thereof by Licensee in accordance with the terms of this Agreement will infringe or otherwise violate the proprietary rights of any person or entity under any patent, trademark, copyright, trade secret or otherwise.

(2) No Adverse Claims. Thione (i) has not been and is not, as of the date of this Agreement, a party to any litigation enforcing or defending its rights in, to or with respect to the Products, (ii) is not aware of any claims or demands made or threatened by any person or entity involving the validity of its rights in, to or with respect to the Products, and (iii) is not aware of any patents, trademarks, copyrights, devices, processes, methods or other intellectual property rights owned or controlled by any third party which may infringe or be infringed by the Products.

(3) Applicable Copyrights, Patents, Trademarks and Licenses. Subject to the provisions of Section 13 hereof (regarding confidentiality), Thione will provide Licensee with true, correct and complete copies or abstracts of all such , patents, patent applications, trademark registrations, trademark applications,  and instruments relating to the Products (and all amendments, supplements and modifications thereof) as it shall obtain, file or enter into during the term of this Agreement.

(4) No Warranty By Licensee. Thione acknowledges that, Licensee, by executing this Agreement and exercising its rights hereunder, makes no representation, warranty, endorsement or certification regarding the effectiveness, quality, character or fitness of (i) the design or specifications of the Products, as established by Thione or (ii) any products not manufactured by or expressly on behalf of Licensee.

D. Product Warranty: Returns. Thione warrants that all units of (1) the Test Kit to be provided under this Agreement shall be designed and manufactured in accordance with good commercial practices and suitable for its intended purposes; and (2) that the ingredients in the Dietary Supplement provided under this Agreement shall substantially conform to the Product specifications as described in the certificate of analysis, attached in Exhibit A. Products shipped by Thione to or for the benefit of Licensee shall for a period of one hundred eighty (180) days after receipt of such Products by Licensee thereof, be free of all defects in material and workmanship and shall conform to the manufacturer's specifications therefor under normal use and service. The foregoing warranty shall be for the benefit of Licensee and all persons and entities purchasing the Products from or through Licensee, all of whom shall be third-party beneficiaries of such warranty. Licensee may return any Product which is not as so warranted. Thione, at its option, shall replace or refund the purchase price of all such returned units of the Products.  The warranty set forth in this Section10.D(1) and (2) for failure to meet specifications shall not extend to units of the Products which have been misused or neglected. Licensee shall have no right to return any unit of the Products for any reason whatsoever other than the failure of such Products to conform to the warranty set forth in this Section 10.D(1) or (2) above.

10

11.   **Force Majeure**. Neither party hereto shall be liable for failure or delay in performing any of its obligations hereunder if such failure or delay is occasioned by compliance with any governmental regulation, request or order, or by circumstances beyond the reasonable control of the party so failing or delaying, including acts of God, war, insurrection, fire, flood, accident, riot, labor strikes, work stoppage or slowdown (whether or not such labor event is within the reasonable control of the parties), delay in obtaining or inability to obtain any required approvals or inability to obtain raw materials, supplies, power or equipment necessary to enable such party to perform its obligations hereunder. Each party shall (a) promptly notify the other in writing of any such event of force majeure, the expected duration thereof and its anticipated effect on the ability of such party to perform its obligations hereunder and (b) make reasonable efforts to remedy any such event of force majeure. If any such event of force majeure shall continue for more than six consecutive months, either party may terminate this Agreement upon both  written notice to the other party, without liability to the other party except for payments accrued and payable as of the date of termination.

12.   **TIME OF ESSENCE**. Time is of the essence with respect to each provision of this Agreement.

13.   **CONFIDENTIAL INFORMATION AND INTELLECTUAL PROPERTY**.

A.   **Confidentiality**. The parties agree that all information disclosed in oral, written, graphic, photographic, recorded, diagramed, digital, electronic or in any other form to it by the other party shall be treated as "Confidential and Proprietary Information" and such party and its members, managers, officers, employees, attorneys and agents will carefully guard and protect all such Confidential and Proprietary Information and will not disclose it to any other person, either orally or in writing, unless first authorized by the disclosing party in writing. Upon termination of this Agreement, the parties agree to return  at once all originals of any Confidential and Proprietary Information furnished to it by the other party without retaining any copies or summaries of any such Confidential and Proprietary Information.

B.   **Intellectual Property**. All patents and  trademarks identified herein  shall be the sole and exclusive property of Thione. Licensee acknowledges that it has no interest in Thione's patents, copyrights, trademarks, trade names, or other intellectual or industrial properties (the "Intellectual Property") and Licensee shall at all times, recognize, respect and protect Thione's rights of ownership of any Intellectual Property related to the Products. Products made in accordance with any modification, improvement, alteration or enhancement to such Intellectual Property (for whatever reason) shall belong solely to Thione and Licensee specifically disclaims any rights to such products.

C.   **Use of Marks**. Thione hereby grants Licensee a limited non-exclusive, non-assignable license and non-licensable privilege to use the trademarks, trade names, service marks and other trade designations of Thione specified herein ("Thione's Marks") for the term of this Agreement in connection with the sale of the Products, provided that due notice of Thione's  proprietary rights is contained on any reproduced material.

D.   **Infringement**. Licensee shall promptly inform Thione of any infringement with respect to any Intellectual Property rights of the Products or Thione's Marks that comes to the attention of Licensee. Then the parties shall discuss possible countermeasures to be taken. Thione shall have the obligation, to bring suit to stop any infringement, violation of or challenge to identified intellectual property rights associated with the Products. Thione shall keep Licensee informed of the status and progress thereof and Licensee shall have the right to participate, at its expense, in any action by counsel of its own choosing. Thione shall not settle or compromise any such action undertaken by Thione that may have a material adverse effect upon Licensee or the business represented by the distribution of the

11

Products without the prior written consent of Licensee, which consent shall not be unreasonably withheld or delayed. Any recovery (whether by award, settlement or otherwise) in any such action undertaken by Thione shall, after providing for reimbursement of the parties for their actual out-of-pocket expenses incurred in connection with such action, be allocated among the parties hereto as their interests may appear.

14.   **NO WAIVER**. The waiver of any default under this Agreement by either party shall not constitute a waiver of the right to terminate this Agreement for any subsequent or like default, and the exercise of the right of termination shall not impose any liability by reason of termination nor have the effect of waiving any damages to which the terminating party might otherwise be entitled.

15.   **FURTHER ACTIONS**. The parties agree to execute such additional documents and to perform all such other and further acts as may be necessary or desirable to carry out the purposes and intents of this Agreement.

16.   **NOTICE**. All notices, requests, demands and other communications under this Agreement or in connection therewith shall be given to or be made upon the respective parties hereto at the following addresses:

If to Thione:

Thione International
Attention: Mr. Mark Hersh
2989 Piedmont Rd.
Suite 200
Atlanta, GA 30305-2700

If to Licensee:

Advanced BodyCare Solutions, LLC
Attention: Mr. Carl Pradelli
2600 N. Military Trail, Suite 410
Boca Raton, FL 33431

Except for purchase orders which may be dispatched via first class mail, fax or e-mail, all other notices, requests, demands, and other communications given or made in accordance with the provisions of this Agreement shall be in writing, shall be forwarded by certified mail or recognized over-night carrier and shall be deemed to have been given when deposited postage prepaid, addressed as specified in the preceding sentence.

17.   **PRODUCT RECALL**. The parties agree that in the event of a product recall of any Product by any governmental authority, this Agreement will then require renegotiation between the parties to reflect the added difficulties imposed upon Licensee (its affiliates and its subdistributors) in attempting to distribute the Products after the changed market circumstances arising from the adverse effects of such recall.

12

18. <u>BENEFIT</u>. This Agreement shall be binding upon and inure to the benefit of the heirs, legal representatives, successors, and the permitted assigns of the parties hereto. This Agreement is personal to the parties hereto and subject only as herein permitted, neither party shall be entitled to assign or sub-contract all nor any part of the rights granted hereunder without the prior written consent of the other party (such consent not to be unreasonably withheld or delayed) except to another entity substantially controlled by it.

19. <u>AMENDMENT</u>. No amendment of this Agreement shall be effective unless embodied in a written instrument executed by all of the parties.

20. <u>INTEGRATION</u>. This Agreement represents the entire understandings and agreements of the parties and supersedes any prior representations and agreements, oral or written.

21. <u>SEVERABILITY</u>. All of the provisions of this Agreement are intended to be distinct and severable. If any provision of this Agreement is or is declared to be invalid or unenforceable in any jurisdiction, it shall be ineffective in such jurisdiction only to the extent of such invalidity or unenforceability. Such invalidity or unenforceability shall not affect either the balance of such provision, to the extent it is not invalid or unenforceable, or the remaining provisions hereof, nor render invalid or unenforceable such provision in any other jurisdiction.

22. <u>COUNTERPARTS</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same Agreement. This Agreement may be executed and delivered via electronic facsimile transmission with the same force and effect as if it were executed and delivered by the parties simultaneously in the presence of one another

23. <u>INCORPORATION OF RECITALS</u>. The Recitals set forth at the beginning of this Agreement are incorporated herein.

24. <u>AUTHORITY</u>. The individuals executing this Agreement on behalf of the party to be charged represent and warrant that they have full and complete authority to bind their principal to the terms and conditions of this Agreement.

25. <u>NO RESTRICTIONS</u>. The parties represent and warrant that the creation and performance of the obligations arising under this Agreement does not violate and is not in conflict with any other obligation, order, decree, rule or law which may be applicable.

26. <u>CAPTIONS</u>. Captions and headings are for convenience only and are not intended to alter the meaning or interpretation of this Agreement.

27. <u>DISPUTES.</u>

A. The parties recognize that disputes as to certain matters may from time to time arise which relate to either party's rights and/or obligations hereunder. It is the objective of the parties to establish procedures to facilitate the resolution of such disputes in an expedient manner by mutual cooperation and without resort to litigation. To accomplish this objective, the parties agree to follow the procedures set forth below and when such a dispute arises between the parties.

13

B.     If any dispute arises between the parties relating to the interpretation, breach or performance of this Agreement or the grounds for the termination thereof, and the parties cannot resolve the dispute within thirty (30) days of a written request by either party to the other party, the parties agree to hold a meeting, attended by the Chief Executive Officer or President of each party, to attempt in good faith to negotiate a resolution of the dispute prior to pursuing other available remedies. If, within sixty (60) days after such written request, the parties have not succeeded in negotiating a resolution of the dispute, such dispute shall be submitted to non-binding arbitration or mediation with a mutually agreed-upon, independent arbitrator or mediator. The arbitration or mediation proceedings shall be held in *Atlanta, Georgia*. Each party shall bear its own costs and legal fees associated with such arbitration or mediation. If no resolution acceptable to both parties is reached through arbitration or mediation, either party may resort to instituting legal action against the other in court and all rights and remedies of the parties shall be preserved in such action. This Agreement shall be interpreted in accordance with the laws of the State of Georgia.

28.     **NO AGENCY CREATED.**  Neither party shall hold itself out to be the agent or employee of the other party and at no time shall either party hold itself out to be a partner or joint venturer of the other party. Neither party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party with regard to any contract, agreement or undertaking with a third party.

29.     **SURVIVAL.**  The provisions of Sections 4(C), 9, 13, 20, 21 and 27 shall survive the termination of this Agreement.

IN WITNESS WHEREOF the parties have executed this Agreement on the date first mentioned above.

Thione International, Inc.                                    Advanced BodyCare Solutions, LLC

By_____               By_____
Wendy K. Barkin, its                                           Carl M. Pradelli, its
Vice President and General Counsel                     CEO & President

14

# EXHIBIT A-1
## DIETARY SUPPLEMENT FORMULATION #25

|  | Formulation # 25 |
|---|---|
|  | For inclusion in: Immune Boosting/Anti-Aging Lozenge |
| One serving = | Se – 70.00 mcg<br>GSH – 50.00 mg<br>NAC – 50.00 mg |
| F.O.B. Price/kg | $326.00 |
| Amount of bottles (30 ct.) per kilo of Thione Complex™ | Unit cost of Thione Complex™ per tablet (one serving) = ~ $0.032<br><br>Unit cost of Thione Complex™ per bottle (30 ct.) = $0.98<br><br>One serving= 100.07 mg, x 30 = 3.021 grams of TAC per 30 ct. bottle<br><br>1 kilo of Thione Complex™ = 332 bottles (30 servings/bottle) |

Thione Antioxidant Complex™ Shelf Life is 2 years from date of manufacture

15

# EXHIBIT A-2
## DIETARY SUPPLEMENT FORMULATION #30

| | Formulation # 30 |
|---|---|
| | For inclusion in: Immune Boosting/Anti-Aging Lozenge |
| One serving = | Se –   70.00 mcg<br>GSH – 100.00 mg<br>NAC – 100.00 mg |
| F.O.B. Price/kg | $326.00 |
| Amount of bottles (30 ct.) per kilo of Thione Complex™ | Unit cost of Thione Complex™ per tablet (one serving) = ~ $0.07<br><br>Unit cost of Thione Complex™ per bottle (30 ct.) = $2.03<br><br>One serving= 200.07 mg, x 30 = 6.21 grams of TAC per 30 ct. bottle<br><br>1 kilo of Thione Complex™ = 161 bottles (30 servings/bottle) |

- Thione Antioxidant Complex™ Shelf Life is 2 years from date of manufacture

# EXHIBIT A-3
## DIETARY SUPPLEMENT FORMULATION #29

|  | Formulation # 29 |
|---|---|
|  | For inclusion in: Immune Boosting/Anti-Aging Lozenge |
| One serving = | Se – 70.00 mcg<br>GSH – 50.00 mg |
| F.O.B. Price/kg | $612.00 |
| Amount of bottles (30 ct.) per kilo of Thione Complex™ | Unit cost of Thione Complex™ per tablet (one serving) = ~ $0.032<br><br>Unit cost of Thione Complex™ per bottle (30 ct.) = $0.96<br><br>One serving= 50.07 mg. x 30 = 1.50 grams of TAC per 30 ct. bottle<br><br>1 kilo of Thione Complex™ = 636 bottles (30 servings/bottle) |

• Thione Antioxidant Complex™ Shelf Life is 2 years from date of manufacture

# EXHIBIT A-4
## DIETARY SUPPLEMENT FORMULATION #31

| | Formulation # 31 |
|---|---|
| | For inclusion in: Immune Boosting/Anti-Aging Lozenge |
| One serving = | Se – 70.00 mcg<br>GSH – 100.00 mg |
| F.O.B. Price/kg | $612.00 |
| Amount of bottles (30 ct.) per kilo of Thione Complex™ | Unit cost of Thione Complex™ per tablet (one serving) = ~ $0.07<br><br>Unit cost of Thione Complex™ per bottle (30 ct.) = $1.97<br><br>One serving= 100.07 mg. x 30 = 3.21 grams of TAC per 30 ct. bottle<br><br>1 kilo of Thione Complex™ = 311 bottles (30 servings/bottle) |

Thione Antioxidant Complex™ Shelf Life is 2 years from date of manufacture

18

# EXHIBIT B-1
## FREE RADICAL MONITOR TEST KIT
## WHOLE TEST KIT

| Product | Description | Quantity | Unit Price (USD) |
|---|---|---|---|
| Free Radical Monitor Kit (2 Tests per kit) | *Antioxidant Home Test Kit* | 10,000 | $4.95 |
| | | 25,000 | $4.25 |
| | | 50,000 | $3.95 |
| | | 100,000 | $3.75 |
| | | | |
| One time set up fee for private labeling graphics | Plates: | 1 | $954.00 |
| | Die: | 1 | $1,035.80 |
| | Film/Proof | 1 | $524.70 |

First quantity reflects minimum order requirement.

Product Shelf Life – 3 years from date of manufacture

Printing: 4 Colors & Varnish

Carton Size: 6 1/16 x 3 1/32 x 5 11/16

Die Cut and Scored inner card: 5 15/16 x 5 9/16

Note: Industry Standard is +/- 10% of ordered quantity.

## EXHIBIT B-2
## FREE RADICAL MONITOR TEST KIT
## COMPONENTS ONLY

| Product | Description | Quantity | Unit Price (USD) |
|---|---|---|---|
| Free Radical Monitor Ampoule | Fill( 1 ml reagent)Ampoule, 5 ml | 5,000 | $1.80 each |
| | | 25,000 | $1.65 each |
| | | 50,000 | $1.50 each |
| | | 100,000 | $1.25 each |
| | | | Price Per Thousand |
| Free Radical Monitor Pipette | Transfer Pipette, Graduated 1 ml, 3 ml volume, Polyethelene | 5,000 | $117.00/M |
| | | 25,000 | $105.00/M |
| | | 50,000 | $90.00/M |
| | | 100,000 | $75.00/M |
| Free Radical Monitor Breaker | Breaker, plastic for 5 ml ampoule | 5,000 | $95.00/M |
| | | 25,000 | $85.00/M |
| | | 50,000 | $75.00/M |
| | | 100,000 | $60.00/M |

First quantity reflects minimum order requirement

Product Shelf Life – 3 years from date of manufacture

Note: Industry Standard is +/- 10% of ordered quantity.

# EXHIBIT C
## GRANDFATHERED ACCOUNTS

In accordance with the provisions of Section 3(C) and without limiting any other rights Thione may have, Thione shall be expressly permitted to promote, sell or otherwise incorporate the Thione Antioxidant Complex™ into:

1. a Vitamin C preparation;
2. a mint or candy with Vitamin C and/or zinc for prevention or treatment of colds or flu

# EXHIBIT D
## BRAND LOGO SPECIFICATIONS

### Logo - Thione Complex Inside™

To help consumers identify products that contain the Thione Complex™, Thione requires manufacturers licensing the Thione Complex Inside™ formula to place the trademark logo on labels and/or cartons. Placement Guidelines for labels and/or cartons are as follows:

1.  Product Labels: **Thione Complex Inside™** logo must be no smaller than 0.373" width by 0.398" height, text size no smaller than 3 pts., placed on front panel or the same panel as the Supplemental Facts or Ingredient List.
2.  Product Cartons: **Thione Complex Inside™** logo must be no smaller than 0.5" width by 0.528" height, text size no smaller than 4 pts., placement on front panel or same panel as Supplement Facts or Ingredient list.
3.  PMS Color: **Thione Complex Inside™** logo swirl is 1655 with black text.  PMS color may not be changed without prior authorized consent from Thione International, Inc.





.373" w
.398" h
3 pt FONT

.5" w
.528" h
4 pt FONT

Florida Bar Number **FORM 1.997.   CIVIL COVER SHEET**

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute 25.075.

## I. CASE STYLE

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT, IN AND FOR PALM
BEACH COUNTY, FLORIDA

ADVANCED BODYCARE SOLUTIONS,
LLC,

CASE NO. **2006 CA 010109 XXXX MB**

            Plaintiff,

v.

THIONE INTERNATIONAL, INC.,

COPY
RECEIVED FOR FILING

SEP 2 8 2006

            Defendant.

SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

_____/

## II. TYPE OF CASE   (Place an x in one box only. If the case fits more than one type of case, select the most definitive.)

| Domestic Relations | Torts | Other Civil |
|---|---|---|
| __ Simplified dissolution | __ Professional Malpractice | ✗ Contracts |
| __ Dissolution | __ Products liability | __ Condominium |
| __ Support - IV-D | __ Auto negligence | __ Real property/ |
| __ Support - Non IV-D | __ Other negligence | __ Mortgage foreclosure |
| __ URESA - IV-D | | __ Eminent domain |
| __ URESA – Non IV-D | | ✗ Other |
| __ Domestic violence | | |
| __ Other domestic relations | | |

## III. Is Jury Trial Demanded In Petition?

__   Yes

_x_   No

DATE: _September 26_ , 2006

SIGNATURE OF ATTORNEY FOR PARTY
INITIATING ACTION

Scott J. Topolski
Florida Bar No. 0006394

BUCKINGHAM, DOOLITTLE & BURROUGHS, LLP
5355 Town Center Road, Suite 900
Boca Raton, FL 33486
Phone: 561 241—0414

«BOCA:122458_v1»

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH, FLORIDA

CASE NO.

ADVANCED BODYCARE SOLUTIONS,
LLC,

        Plaintiff,

v.

THIONE INTERNATIONAL, INC.,

        Defendant.

_____/

**50 2006 CA 010109 XXXX MB**

COPY
RECEIVED FOR FILING 

SEP 2 8 2006

SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

## **COMPLAINT**

    Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC, for its Complaint, alleges:

### **PARTIES, JURISDICTION AND VENUE**

1.    This is an action for declaratory relief and damages in excess of Fifteen Thousand ($15,000.00) Dollars, exclusive of interest, costs and attorney's fees.

2.    Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC ("Plaintiff" or "Advanced"), is a Delaware limited liability company, registered to do business in Florida and with its principal place of business in Palm Beach County, Florida.

3.    At all times material hereto and upon information and belief, Defendant, THIONE INTERNATIONAL, INC. ("Defendant" or "Thione"), is and was a Georgia corporation with its principal place of business in Atlanta, Georgia.

4.    Thione is subject to the jurisdiction of this Court, under Fla. Stat. § 48.193, by virtue of its:

    a.    having committed certain acts giving rise to the claim or claims stated herein within the state of Florida;

1

b.      operating, conducting, engaging in or carrying on a business or business venture in Florida; and

c.      engaging in substantial and not isolated activity in Florida.

5.      Venue is proper with this Court in that Thione, as a non-Florida corporation, can be sued in any county in Florida.

## FACTUAL ALLEGATIONS

6.      Advanced is engaged in the business of developing, distributing and marketing nutritional supplements, topicals and other related technologies throughout the world.

7.      Upon information and belief, Thione:

a.      has developed a proprietary antioxidant complex known as the "Thione Antioxidant Complex" to reduce free radical damage to the body;

b.      has developed a home test kit (the "Free Radical Monitor Test Kit") to monitor the body's free radicals;

c.      is the owner of certain patents and trademarks related to the Thione Antioxidant Complex and Free Radical Test Kit; and

d.      is engaged in the manufacture and distribution of the Thione Antioxidant Complex and Free Radical Test Kit.

8.      On or about April, 2004, Advanced and Thione entered into a Supply and Licensing Agreement (the "Agreement").   A copy of the Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

9.      Pursuant to the Agreement, Advanced agreed to purchase from Thione:

a.      the Dietary Supplement, as defined in the Agreement, at a price specified in Exhibit A to the Agreement and pursuant to certain minimum order requirements as set forth in Exhibits

2

A-1, A-2, A-3 and A-4 to the Agreement; and

      b.    the Test Kit, as also defined in the Agreement, pursuant to the prices and minimum order requirements set forth in Exhibits B-1 and B-2 to the Agreement.

      10.    The Dietary Supplements and Test Kits purchased by Advanced from Thione were to be shipped to such locations as directed by Advanced.

      11.    Pursuant to Paragraph 3A of the Agreement, Advanced was provided with what was an exclusive license to "advertise, promote, market, sell and otherwise distribute the tableted Dietary Supplement for the purposes of anti-aging, repletion of endogenous antioxidant stores and/or immune system boosting" in North America.

      12.    Similarly, pursuant to Paragraph 3B of the Agreement, Advanced was provided with the "authority to assemble the individual Components into a Test Kit" and what was an exclusive license to "advertise, promote, market, sell and otherwise distribute the Test Kit" in North America.

      13.    Paragraph 6B of the Agreement provides:

Termination Upon Breach. Either party may terminate this Agreement upon thirty (30) days written notice thereof to the other party upon the breach by the other party of any of its material representations, warranties, covenants, or agreements contained in this Agreement. Upon the expiration of such notice period, this Agreement shall terminate without the need for further action by either party; provided, however, that if the breach upon which such notice of termination is based shall have been fully cured to the reasonable satisfaction of the terminating party within such 30-day period, then such notice of termination shall be deemed rescinded, and this Agreement shall be deemed reinstated and in full force and effect. Such right of termination shall be in addition to such other rights and remedies as the terminating party may have under applicable law.

      14.    Paragraph 5 of the Agreement provides:

Early Termination By Thione. Without affecting or limiting any other rights which Thione may have hereunder at law or in equity, Thione shall have the right, upon thirty (30) days prior written notice to [Advanced], to terminate the Agreement upon the occurrence of any of the following events:

      1.    Failure of [Advanced] to make the minimum payments herein after thirty (30) days prior written notice of such failure to pay has been provided in accordance with Section 5 and an opportunity to cure the same; or

3

       2.     The breach by [Advanced] of the exclusivity or territorial limitations contained in this Agreement; or

       3.     The breach by [Advanced] of any warranty, obligation, covenant or agreement under this Agreement except as otherwise provided herein.

15.     Under Paragraph 5D of the Agreement, once the Agreement was terminated, "all the terms and obligations provided for in this Agreement shall remain in effect up to the expiration of any applicable termination notice period, if any."

16.     On or about May 26, 2004, Advanced ordered 25,000 Test Kits and wired the sum of $41,250.00 to Thione's bank account. These Test Kits were shipped to Advanced's warehouse in Orlando and arrived there on or about September 1, 2004.

17.     On or about June 28, 2004, Advanced placed an Order for the Dietary Supplements and wired the sum of $15,300.00 to Thione's bank account. The Dietary Supplements purchased pursuant to this Order were shipped to Advanced's manufacturer, Garden State Nutritionals.

18.     The purchase orders described in Paragraphs 16 and 17 above satisfied Advanced's purchase obligations under the Agreement through the third calendar quarter of 2004.

19.     Unfortunately, the first shipment of ampoules, which were part of the Test Kits, included numerous broken ampoules and contained over 1,000 unbroken ampoules with a strange pinkish color, suggesting that the liquid had oxidized. Advanced immediately contacted Thione's representative, Mark Hersh, who instructed Advanced to collect and retain the evidence in order to file a claim with the shipping company.

20.     Throughout the middle and latter part of 2004, Advanced worked diligently with Thione in connection with a marketing plan/program, including script development and related preparations for a television commercial, to market the Dietary Supplements and Test Kits.

21.     Because of Thione's protracted review, revision and editing of the marketing plan/

program and related documents and despite Advanced's diligent efforts, a marketing plan/program, including the script for the aforementioned television commercial, was not finalized until approximately December of 2004.

22.    In light of the delays associated with Thione's review, revision and editing of the marketing plan/program and related documents, the need to test the marketing plan/program and the defects in the ampoules previously shipped to Advanced, Advanced advised Thione that it could not commit to the purchase order threshold, as set forth in the Agreement, for the fourth quarter of 2004.

23.    In late December 2004, Advanced discovered that more of the ampoule inventory was turning the strange pinkish color.  Advanced immediately notified Thione of the issue and sent via overnight delivery service a box of the defective ampoules.

24.    In light of Advanced's reluctance to commit to the purchase order threshold which would maintain Advanced's exclusivity for the fourth quarter of 2004 as set forth in the Agreement and despite the delay in launching the advertising campaign and the new discovered problem with a key component of the Test Kit and Thione's apparent need for the funds associated with that purchase order threshold, Advanced and Thione agreed, in or about late December of 2004, on what was, in effect, a compromise, namely Advanced agreed to make a good faith deposit of $72,450.00 on a future purchase order, with the specific quantity of components to be specified in the very near future.

25.    Accordingly, Advanced wired the sum of $72,450.00 to Thione's bank account on or about January 7, 2005.

26.    Several weeks later, on or about January 25, 2005, Thione's counsel, Wendy Barkin, sent an email to Advanced's counsel, Beth Geller (the "Barkin email"), indicating that Thione was concerned about a possible "breach" of the contract because of Advanced's alleged failure to order more Dietary Supplements and Test Kits from Thione but without terminating or attempting to terminate the Agreement

5

and without referring to any particular contractual provision relating to termination.

27.     Under Paragraph 16 of the Agreement, any termination notice was required to be in writing and forwarded to the other party by certified mail or a recognized over-night carrier.

28.     There were no further written or oral communications from Thione to Advanced, through the remainder of 2005, suggesting that Advanced had potentially breached the Agreement and, in fact, the parties continued to communicate and interact with each other in a manner consistent with an ongoing business relationship and an agreement in full force and effect.  To that end and in connection with its efforts to market the Dietary Supplements and Test Kits, Advanced, with the full knowledge, consent and acquiescence of Thione, retained a retail distributor, made a commitment to have a direct mail piece written featuring the product and was actively working on an absorption study.

29.     Despite Thione's denial of a problem with the ampoules, by February of 2005, Advanced learned that approximately 20 percent of the original ampoules shipped by Thione were defective.

30.     In the months succeeding February, 2005, Advanced and Thione exchanged numerous emails regarding the defective nature of the ampoules and potential reasons why the ampoules were defective.

31.     In April of 2005, Thione finally acknowledged the manufacturing defects in the ampoules, which amounted to 50 percent of the ampoules originally received by Advanced in 2004.  Thione committed to replacing the defective ampoules.

32.     In October of 2005, Thione shipped 6,734 new ampoules to Advanced's warehouse in Orlando, leaving approximately 6,000 defective ampoules that have never been replaced.

33.     In August of 2006, Thione advised Advanced that it considered the Barkin email to be formal notification of termination of the Agreement, despite the fact that throughout 2005 and 2006, up until August of 2006, Thione retained a deposit for additional product and communicated and transacted

6

with Advanced in a manner consistent with an ongoing business relationship and an agreement in full force and effect.

34.     All conditions precedent to bringing this action have been performed, have occurred or have been waived.

35.     Advanced has retained the undersigned attorneys and is obligated to pay them reasonable attorney's fees for their services.

## COUNT I
## BREACH OF CONTRACT

36.     Advanced repeats and realleges the allegations contained in Paragraphs 1 through 35 of this Complaint as if set forth herein at length.

37.     Thione's purported termination of Advanced was a violation and breach by Thione of the specific terms of Paragraph 5 of the Agreement.

38.     Thione further breached the Agreement by supplying defective ampoules to Advanced.

39.     Advanced has suffered damages as a result of Thione's breach of the Agreement.

40.     Advanced has fully performed its obligations under the Agreement or full performance has been excused.

WHEREFORE, Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC, respectfully requests that this Court enter judgment against Defendant, THIONE INTERNATIONAL, INC., for damages, together with interest, attorneys' fees, the costs of this action and such other and further relief that this Court deems just and equitable.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

41.     Advanced repeats and realleges the allegations contained in Paragraphs 1 through 35 of this Complaint as if set forth herein at length.

42.     Implied in the Agreement is a mutual covenant of good faith and fair dealing, i.e., both Thione and Advanced agreed to act in good faith and deal with each other fairly and to refrain from engaging in any acts which violated the covenant of good faith and fair dealing.

43.     Advanced expended substantial time and money in dutifully performing its obligations pursuant to the Agreement and in reliance upon Thione's outward actions and statements which were consistent with an ongoing business relationship and an agreement in full force and effect.

44.     Thione's actions in:  a.)  advising Advanced, via the Barkin email, about a potential breach of the Agreement but without terminating or attempting to terminate the Agreement and choosing to do nothing else; b.) never subsequently terminating or attempting to terminate the Agreement; c.) retaining a deposit for product; d.) communicating and transacting with Advanced in a manner consistent with an ongoing business relationship and an agreement in full force and effect; and e.) waiting until August of 2006, after Advanced had already expended substantial time and money in performing its obligation under the Agreement, to advise Advanced that it considered the Agreement terminated, constitute a breach of the implied covenant of good faith and fair dealing.

45.     Advanced has suffered damages as a result of Thione's breach of the implied covenant of good faith and fair dealing.

WHEREFORE, Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC, respectfully requests that this Court enter judgment against Defendant, THIONE INTERNATIONAL, INC., for damages, together with interest, attorneys' fees, the costs of this action and such other and further relief that this Court deems just and equitable.

## COUNT III - DECLARATORY RELIEF

46.     Advanced repeats and realleges the allegations contained in Paragraphs 1 through 35 of his Complaint as if set forth herein at length.

8

47.     Pursuant to Paragraph 5A of the Agreement, upon termination of the Agreement, Advanced has "a period of six (6) months to sell-off remaining inventory levels of Products."

48.     Advanced currently maintains certain inventory levels of the Test Kits and Dietary Supplements in its warehouse in Orlando.

49.     Because of Thione's now apparent reliance on the Barkin email in support of the purported termination of the Agreement, Advanced is unsure of its rights with regard to the sale of remaining inventory levels of Dietary Supplements and Test Kits.

50.     There is a bona fide, actual, present, practical need for the declaration of Advanced's rights under the Agreement.

51.     All of the parties who have, or reasonably may have an actual, present, adverse and antagonistic interest in the subject matter have been joined in this lawsuit.

52.     The relief sought herein is not merely to give legal advice or answer questions propounded by curiosity.

53.     Advanced has no adequate remedy at law.

WHEREFORE, Plaintiff, ADVANCED BODYCARE SOLUTIONS, requests that this Court enter Judgment declaring:

a.      Advanced's rights with regarding to the sale of any inventory of Test Kits and Dietary Supplements currently located in Advanced's warehouse;

b.      Advanced is entitled to an award of attorney's fees and costs; and

c.      such other and further relief as the Court deems just and proper.

### COUNT IV - CONVERSION

54.     Advanced repeats and realleges the allegations contained in Paragraphs 1 through 35 of this Complaint as if set forth herein at length.

9

55.     Beginning on or about January 7, 2005, Thione converted to its own use the sum of $74,450.00 belonging to Advanced and has specifically advised Advanced that it no longer has or possesses said funds.

56.     Advanced has suffered damages as a result of Thione's above-described acts of conversion.

57.     Pursuant to § 768.72, Fla. Stat., Advanced reserves the right to amend this Complaint to assert a claim for punitive damages upon demonstrating a reasonable basis for recovery of such punitive damages by a reasonable showing by evidence in the record or otherwise proffered by Advanced.

WHEREFORE, Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC, respectfully requests that this Court enter judgment against Defendant, THIONE INTERNATIONAL, INC., for damages, together with interest, the costs of this action and such other and further relief that this Court deems just and equitable.

## COUNT V – BREACH OF IMPLIED WARRANTY

58.     Advanced repeats and realleges the allegations contained in Paragraphs 1 through 35 of this Complaint as if set forth herein at length.

59.     Thione impliedly warranted that the goods it was manufacturing and supplying to Advanced were of good quality and free from defects and faults.

60.     The goods manufactured and supplied by Thione to Advanced, more particularly, the ampoules, were not of good quality and were not free from defects and faults.

61.     Thione breached its implied warranty to Advanced by manufacturing and supplying ampoules that were not of good quality and that were not free from defects and faults.

62.     The ampoules manufactured and supplied by Thione to Advanced were defective when they were transferred from Thione to Advanced.

10

63. Advanced has informed Thione that the ampoules do not conform to the Agreement.

64. As a result of Thione's actions, Advanced has suffered damages.

WHEREFORE, Plaintiff, ADVANCED BODYCARE SOLUTIONS, LLC, respectfully requests that this Court enter judgment against Defendant, THIONE INTERNATIONAL, INC., for damages, together with interest, the costs of this action and such other and further relief that this Court deems just and equitable.

Dated this _____ day of September, 2006.

BUCKINGHAM, DOOLITTLE & BURROUGHS, LLP
Attorneys for Plaintiff, Advanced BodyCare Solutions, LLC
5355 Town Center Road, Suite 900
Boca Raton, Florida 33486
Telephone:  561 241-0414
Facsimile:  561 241-9766


By_____
            Scott J. Topolski
            Florida Bar No. 0006394

«BOCA:123632_v2»

11

# EXHIBIT A

## SUPPLY AND LICENSING AGREEMENT

THIS SUPPLY AND LICENSING AGREEMENT ("Agreement") is entered as of this 1st day of April, 2004 by and between Thione International, Inc., a Georgia corporation ("Thione" or "Licensor") and Advanced BodyCare Solutions, LLC, a Delaware limited liability company ("ABCS" or "Licensee").

## WITNESSETH:

WHEREAS, Thione has developed a proprietary antioxidant complex known as the "Thione Antioxidant Complex™," useful for reducing free radical damage to the body as described in its United States Patent #5,922,346; and

WHEREAS, Thione has developed a test kit for use in the home for the purpose of monitoring the body's free radicals ("Free Radical Monitor Test Kit"); and

WHEREAS, as a result of the expenditure of time, effort and money, Thione is the owner of certain patents, trademarks, methods and trade secrets relating to the Thione Antioxidant Complex™ and Free Radical Monitor Test Kit; and

WHEREAS, Thione is also engaged in the manufacture and distribution of the Thione Antioxidant Complex™ and the Free Radical Monitor Test Kit; and

WHEREAS, Licensee is engaged in the development, distribution and marketing of nutritional supplements, topicals and other technologies worldwide; and

WHEREAS, the parties contemplate Licensee marketing and distributing the Free Radical Monitor Test Kit and the Thione Antioxidant Complex™ in the territory (as defined in Section 1 below) via the distribution channels outlined in Section 3 below.

NOW, THEREFORE, in consideration of mutual covenants and promises herein contained, the parties agree as follows:

1. **DEFINITIONS.**  For purposes of this Agreement, the following definitions shall apply:

A.    **"Dietary Supplement."**  The term "Dietary Supplement" shall mean the Thione Antioxidant Complex™ in a formulation that is: (1) composed of more than 49 mg. of L-Glutathione (reduced) per serving, N-Acetyl-L-Cysteine and L-Selenomethionine. The specific formulas for the Dietary Supplement governed by this Agreement are attached hereto as Exhibits A-1, A-2, A-3 and A-4 and by this reference incorporated herein.

B.    **"Product"** or **"Products."**  The term "Product" or "Products" shall mean the Dietary Supplement or the Test Kit, individually or collectively, as applicable.

C.    **"Territory."**  The term "Territory" shall mean the United States of America.

D.      **"Test Kit."** The term "Test Kit" shall mean the Free Radical Monitor Test Kit which may consist of either: (1) an entire kit which includes two (2) complete home test kits ("Whole Test Kit"); or (2) solely the test kit components which may consist of of the ampoule, pipette and breaker, individually, or any combination thereof (hereinafter the "Components"). The Test Kit and the Components are more particularly described in Exhibits B-1 and B-2, attached hereto and by this reference incorporated herein.

2.      <u>SUPPLY OF PRODUCTS</u>. Subject to the terms and conditions incorporated herein, Thione agrees to use commercially reasonable efforts to supply and sell to Licensee and Licensee agrees to purchase from Thione the following Products:

A.      **Dietary Supplement**. Thione shall supply to Licensee or its designee the Dietary Supplement in the form of unmixed, bulk powder in one or more of the formulations specified in Exhibit A. The price per kilogram for the Dietary Supplement is set forth in Exhibit A. The minimum order of the Dietary Supplement is 50 kilos for Exhibits A-1 and A-2 and 25 kilos for Exhibits A-3 and A-4 and the lead time is eight (8) weeks from receipt of a purchase order. Licensee shall thereafter be solely responsible, at its cost, for the further processing, mixing and packaging of the raw material into a consumable chewable/dissolvable tablet for buccal absorption. It will be the sole responsibility of Licensee to manufacture the tablet, to obtain bottles and to fill and label such bottles at its own expense. Licensee shall also be responsible, at its cost, for complying with any regulations, rules, laws, ordinances or other requirements respecting the storage, handling, marketing, promoting, sale and distribution of the Dietary Supplement.

B.      **Test Kit**. At Licensee's direction, Thione shall supply to Licensee the Test Kit either as a Whole Kit or solely as Components. The minimum order requirements, prices and set-up fees for plates, film proof and dies for the Whole Test Kit are set forth in Exhibit B-1. The minimum order requirements and prices for the Components are set forth in Exhibit B-2. The lead time is typically twelve (12) weeks from the receipt of a purchase order, but is 12 weeks from approval of graphics following receipt of a purchase order if the Whole Test Kits are for private labeling. Licensee shall also be responsible, at its cost, for complying with any regulations, rules, laws, ordinances or other requirements respecting the storage, handling, marketing, promoting, sale and distribution of the Whole Kit or the Components.

C.      **Shipping and Additional Expenses.** The Products shall be shipped to such location(s) as specified by Licensee in its purchase orders that are issued and directed to Thione from time-to-time. For each order, Licensee shall also pay:

(1)     All costs and expenses of shipping the Products from the following designated facilities to such location(s) specified by Licensee (including any taxes, insurance and other charges as levied by the shipper):

(a)     **Whole Test Kit:** F.O.B. Plant in New Jersey

(b)     **Components:** F.O.B. Thione's Atlanta Warehouse

(c)     **Dietary Supplement:** F.O.B. Plant for each individual ingredient

(2)     Sales taxes, if any, levied in connection with the sale of the Product from Thione to Licensee.

2

D. **Price Increases.** The prices stated in Exhibits A and B shall remain in effect for a period of six (6) months from the date of this Agreement. Thereafter, within thirty (30) days prior to the beginning of each quarter, Thione will quote to Licensee the prices and other terms and conditions that will be applicable for the succeeding quarter. Notwithstanding the foregoing, if at any time, Thione experiences, in the aggregate, a ten percent (10%) or more increase in its labor or material costs for either or both of the Products, the prices hereunder will increase in a corresponding amount; provided however, that Thione shall use commercial reasonable efforts to find a lower cost source for such labor and/or material within thirty (30) days of its receipt of such notice of its price increase.

3. **LICENSE.**

A. **Dietary Supplement.** Except as provided below, subject to the terms and conditions set forth herein and without rights to sub-license, Thione hereby grants to Licensee, during the Term (as defined in Section 5 hereunder), the license and authority to manufacture a chewable/suckable tablet incorporating the Dietary Supplement and to advertise, promote, market, sell and otherwise distribute the tableted Dietary Supplement for the purposes of anti-aging, repletion of endogenous antioxidant stores, and/or immune system boosting in the Territory on an exclusive basis by such means and media as ABCS may determine, in the following channels of distribution: (i) airings of a commercial on broadcast, cable, satellite and all other forms of television transmission now existing or hereafter developed, (ii) television shopping programs such as those aired by QVC and Home Shopping Network ("Television Home Shopping Shows"), (iii) radio, (iv) print media, (v) direct-mail solicitation, (vi) package inserts, (vii) inbound and outbound telemarketing, (viii) credit card syndication, (ix) catalogues, (x) wholesale and retail channels; and (xi) computer transmissions such as commercial on-line services and the Internet.

(1)     Notwithstanding anything to the contrary above or elsewhere herein, Thione retains the right to, and nothing contained in this Agreement shall limit or affect Thione's right to, manufacture, advertise, promote, market, sell and/or license others to the rights to manufacture, advertise, promote, market, sell or otherwise distribute: (a) the Dietary Supplement outside the Territory by any means or method whatsoever or, within the Territory, through distribution channels other than as stated in Section 1.A.(i) through (xi) above, including, but not limited to professional markets, multi-level marketers and the government; and (b) the Thione Antioxidant Complex™ for all other applications except as specifically described herein, including without limitation, skin care, oral care, oral cosmeceutical applications or as an addition to other dietary supplements or OTC products.

(2)     Licensee acknowledges that it is not acquiring the right to, and covenants and agrees that it will not, and will not authorize or permit others to, advertise, promote, market, sell or otherwise distribute the Dietary Supplement (tableted or otherwise) (a) outside the Territory or (b) within the Territory, through any distribution channel other than as stated in Section 1.A. (i) through (xi) above without the express written consent of Thione.

(3)     Licensee expressly acknowledges that it is not acquiring the right to, and covenants and agrees not to manufacture the Dietary Supplement itself.

3

B. **Test Kit.** Except as provided below, subject to the terms and conditions set forth below and without rights to sub-license, Thione hereby grants to Licensee, during the Term, the license and authority to assemble the individual Components into a Test Kit, and to advertise, promote, market, sell and otherwise distribute the Test Kit in the Territory through the Section 1.A. (i) through (xi) channels of distribution on an exclusive basis.

      (1)    Notwithstanding anything to the contrary above or elsewhere herein, Thione retains the right to, and nothing contained in this Agreement shall limit or affect Thione's right to, manufacture, advertise, promote, market, sell and/or license others to the rights to manufacture, advertise, promote, market, sell or otherwise distribute the Test Kit outside the Territory by any means or method whatsoever or, within the Territory, through distribution channels other than as stated in Section 1.A.(i) through (xi) above, including, but not limited to professional markets, multi-level marketers and the government.

      (2)    Licensee acknowledges that it is not acquiring the right to, and covenants and agrees that it will not, and will not authorize or permit others to, advertise, promote, market, sell or otherwise distribute the Test Kit (a) outside the Territory or (b) within the Territory, through any distribution channel other than as stated in Section 1.A. (i) through (xi) above without the express written consent of Thione.

      (3)    Licensee expressly acknowledges that it is not acquiring the right to, and covenants and agrees not to manufacture the ampoules component of the Test Kit or the Test Kit itself.

C. **Grandfathered Accounts.** Notwithstanding the foregoing exclusive rights, and in addition to the rights retained by Thione, Licensee agrees to allow Thione to continue to sell the preparations listed in Exhibit C, attached hereto and by this reference incorporated herein, as an oral product with the Thione Complex™, but not for further distribution to other than end use consumers.

D. **Cooperation.** Thione agrees to share with Licensee Thione's technology to produce a tablet for the Dietary Supplement and will share with Licensee any improvements to the Dietary Supplement and the Test Kit that may be applicable hereunder which shall be cross licensed to the parties hereto, but owned by Thione in accordance with Section 13(B).

E. **Product Groupings.** Thione acknowledges that Licensee shall have the right to develop such groupings and ensembles of the Products and other ancillary goods for sale as Licensee may determine.

F. **Distributors and Subdistributors.** Licensee may appoint such distributors and subdistributors as it may deem appropriate in order to market and distribute the Products pursuant to written agreements previously approved in writing by Thione, such approval not to be unreasonably withheld. Such agreements must, among other things, provide that Licensee's subdistributors are subject to all of the obligations imposed upon Licensee under this Agreement and that the rights of the subdistributor will terminate immediately upon the termination of this Agreement.

4.  **MARKETING.**

   A.      Licensee shall use commercially reasonable efforts to actively advertise, promote, supply and market the Products during the Term of this Agreement, all in accordance with the terms and conditions of this Agreement.

   B.      Licensee shall include the Thione Complex™ brand mark on all printed marketing, advertising and promotional materials including, but not limited to, labeling, packaging and collateral materials.  The Thione Antioxidant Complex™ brand logo specifications are attached hereto as Exhibit D and by this reference incorporated herein.

   C.      Specimens of all proposed labeling, packaging, promotional, advertising, and any and all other collateral materials Licensee intends to use in connection with the advertising, promoting, marketing, sale and distribution of the Products must be forwarded by Licensee to Thione for prior approval, which approval shall not be unreasonably withheld or delayed.  Thione shall have ten business (10) days from receipt of such specimen materials to comment, approve or disapprove of such proposed materials and the failure by Thione to respond within the above period without good reason shall be considered acceptance by Thione of the proposed materials. Notwithstanding the approval process described above, Licensee shall be solely responsible for ensuring compliance with any advertising or similar governmental regulations applicable to such materials and Thione shall have no liability whatsoever to Licensee, any government agency or other third party resulting from Licensee's failure to comply with any such regulations.

   D.      As evidence of its marketing activities, Licensee shall provide Thione, from time to time, with copies of the advertisements, catalogues, and other promotional materials of the Products it utilizes.

   E.      Dr. Hersh will be available to Licensee, on a reasonable basis, to support the market position of the Products. Upon prior written notice and subject to his other professional and personal commitments, his services may include speaking engagements, radio, print and television interviews and quotes for use in literature, however, under no circumstances whatsoever shall Dr. Hersh's name, likeness or opinions be used or expressed in any manner without his express written consent. Licensee shall be responsible for travel expenses for Dr. Hersh and accompanying associate (Dr. Hersh is legally blind and requires assistance), together with an accommodation allowance of $250.00 per diem and a food allowance of $200.00 per diem. Notwithstanding the foregoing, if, in the sole opinion of Dr. Hersh, the activities hereunder are encroaching on his ability to allocate sufficient time to his other professional commitments, Dr. Hersh shall be entitled to receive a reasonable consultant fee for his services.

5.      **TERM AND TERMINATION.**

   A.         This Agreement, unless terminated earlier as provided herein, shall remain in full force and effect from April 1, 2004 to March 31, 2009. Upon the expiration of such term, this Agreement shall automatically be extended for additional one-year periods unless either party provides sixty (60) days prior written notice of termination to the other party.  If this Agreement is not renewed, all rights to advertise, promote, market, sell or otherwise distribute the Products shall end and Licensee shall immediately cease further marketing or sale of the Products.  Notwithstanding the

5

foregoing, upon termination hereunder, Licensee shall have a period of six (6) months to sell-off remaining inventory levels of Products.

B.    <u>Termination Upon Breach.</u> Either party may terminate this Agreement upon thirty (30) days written notice thereof to the other party upon the breach by the other party of any of its material representations, warranties, covenants, or agreements contained in this Agreement. Upon the expiration of such notice period, this Agreement shall terminate without the need for further action by either party; <u>provided, however,</u> that if the breach upon which such notice of termination is based shall have been fully cured to the reasonable satisfaction of the terminating party within such 30-day period, then such notice of termination shall be deemed rescinded, and this Agreement shall be deemed reinstated and in full force and effect. Such right of termination shall be in addition to such other rights and remedies as the terminating party may have under applicable law.

C.    **Early Termination By Thione**. Without affecting or limiting any other rights which Thione may have hereunder at law or in equity, Thione shall have the right, upon thirty (30) days prior written notice to Licensee, to terminate this Agreement upon the occurrence of any of the following events:

1.    Failure of Licensee to make the minimum payments herein after thirty (30) days prior written notice of such failure to pay has been provided in accordance with Section 6 and an opportunity to cure the same; or

2.    The breach by Licensee of the exclusivity or territorial limitations contained in this Agreement; or

3.    The breach by Licensee of any warranty, obligation, covenant or agreement under this Agreement except as otherwise provided herein.

D.    Upon expiration or termination of this Agreement, all the terms and obligations provided for in this Agreement shall remain in effect up to the expiration of any applicable termination notice period, if any.

6.    <u>**ANNUAL MINIMUM PURCHASE REQUIREMENTS**</u>.

A.    **Annual Minimum Purchase Requirements.** Subject to the minimum order requirements set forth in Section 2.A. and Exhibits B-1 and B-2, Licensee shall order the Products, in any combination thereof, at its discretion in at least the minimum United States Dollar ($) amounts according to the schedule below. All orders for Products received prior to December 31, 2004 shall be applied to the 4th Quarter 2004 minimums.

| | 1st Quarter Jan. 1st - Mar. 31st | 2nd Quarter April 1st – June 30th | 3rd Quarter July 1st - Sept. 30th | 4th Quarter Oct. 1st - Dec. 31st |
|---|---|---|---|---|
| 2004 | XX | XX | XX | $201,450.00 |
| 2005 | $268,600.00 | $335,750.00 | $537,200.00 | $537,200.00 |
| 2006 | $537,200.00 | $537,200.00 | $537,200.00 | $537,200.00 |
| 2007 | $537,200.00 | $550,000.00 | $550,000.00 | $550,000.00 |
| 2008 | $550,000.00 | $550,000.00 | $555,000.00 | $555,000.00 |
| 2009 | $555,000.00 | | | |

In the event the term of this Agreement is extended as provided for in Section 5.A. above, the parties agree to negotiate new annual minimum purchase requirements for such new term within thirty (30) days prior to expiration of the current term, but in no event shall such new annual minimum purchase requirements be less than one hundred ten percent (110%) than those in effect at the end of the current term.

B.   **Effects of Deficiencies.** If Licensee fails to order and pay for at least the minimum dollar amount of Products during any applicable period of time, this Agreement and the exclusive license granted to Licensee in Section 3 above shall, as of such date, at the sole and absolute discretion of Thione: (1) be terminated; (2) be re-negotiated with respect to price, duration or similar aspect; or (3) be changed from an "exclusive" license to a "non-exclusive" license for the balance of the term of this Agreement (subject to all other terms, conditions and limitations of this Agreement). Notwithstanding the foregoing, prior to exercising any of the afore-mentioned rights, Thione shall provide Licensee with thirty (30) days prior written notice to remedy any purchase deficiency and if Licensee cures such minimum dollar order shortfall within such 30 day period, the exclusive license shall remain intact.

7.   **PAYMENTS AND PURCHASE ORDERS.**   Subject to any other terms and conditions contained herein, all purchase orders must meet the minimum order requirements set forth in Section 2 and/or Exhibits B-1 and B-2.

A.   **Time for Payment.** Except as provided in paragraph B below, Thione grants Licensee the following payment terms:

(1) Initial order – payment in full with purchase order;
(2) All subsequent orders – 50% of the purchase order amount due with the purchase order and 50% Net 30 from Licensee's receipt of all purchased Products;
(3) Notwithstanding the foregoing payment terms, as the initial roll-out of the Products increases, Thione agrees to negotiate with its suppliers for better payment terms such as "Net 30 days" and agrees that when it is successful in attaining better terms for itself, it shall pass on such terms to Licensee and this Agreement shall be so modified.

B.   **Initial Purchase.** Licensee shall place an initial purchase order for Products with Thione no later than thirty (30) days after the execution of this Agreement in order to initiate this contractual relationship with any such purchases or dollar amounts to be applied to Licensee's 2004 minimum purchase and payment requirements in accordance with the terms hereunder.

7

8.      **RANDOM TESTING**. Licensee warrants that the finished product that incorporates the Dietary Supplement shall contain the quantity and purity of the Thione Complex™ described in Exhibit A.  Thione has the right to do random HPLC testing on any production lot of such finished "Dietary Supplement" product to verify composition quantity and purity.

9.      **INDEMNIFICATION.**

A.      **Indemnification of Thione.**  Licensee shall indemnify, defend and hold harmless Thione, its members, managers, employees, officers, directors, shareholders, attorneys and agents harmless from all claims, demands, causes of action, suits, proceedings, damages, costs, expenses and the like, arising from or related to: (1) the storage, handling, promoting, marketing, advertising, sale or distribution of the Products, or the manufacture and conversion of bulk Product to packaged Product pursuant to this Agreement; and (2) the breach by Licensee of any of its warranties, covenants, obligations, agreements or duties under this Agreement.  This obligation of indemnification shall survive termination of this Agreement. Licensee shall maintain a policy of insurance, naming Thione as an additional insured, covering any liability or claims arising from the foregoing.  The insurance shall have limits of not less than Two Million Dollars ($2,000,000.00).  Upon request, Licensee shall deliver to Thione a Certificate of Insurance evidencing such insurance.

B.      **Indemnification of Licensee.**  Thione shall indemnify, defend and hold harmless Licensee, its members, managers, employees, attorneys and agents harmless from any claims, demands, causes of action, suits, proceedings, damages, costs, expenses and the like, arising from or related to the design, manufacture, use and/or consumption (by end-users or otherwise) of the Products provided to Licensee pursuant to this Agreement unless attributable to the acts or omissions of Licensee.  In addition, Thione will obtain a policy of insurance, naming Licensee as an additional insured, covering any liability or claims arising from the foregoing.

C.      **Indemnification Procedures.**  In the event that any legal proceeding is instituted or any claim or demand is asserted by any third party which may give rise to any damage, liability, loss or cost or expense in respect of which either party has indemnified the other party under this Agreement, the indemnified party shall give the indemnifying party written notice of the institution of such proceedings or the assertion of such claim or demand, promptly after the indemnified party first becomes aware thereof; provided, that the failure of the indemnified party to promptly give notice of any such proceeding, claim or demand to the indemnifying party shall not relieve the indemnifying party of its indemnification obligations hereunder except to the extent that such failure actually and materially prejudices the rights of the indemnifying party.  The indemnifying party shall have sole control over the defense and/or settlement of any such proceeding, claim or demand; provided, that (i) the indemnified party may participate in any such proceeding with counsel of its choice at its own expense, and (ii) the indemnifying party shall not, without the written consent of the indemnified party, consent to the entry of any judgment or enter into any settlement that provides for any injunctive or other nonmonetary relief affecting the indemnified party or that does not include as an unconditional term thereof the giving by the claimant or plaintiff to the indemnified party of a release from all liability with respect to such proceeding, claim or demand.  In the event that the indemnifying party does not accept the defense of any matter as above provided, or counsel for the indemnified party advises the indemnified party that there are issues which raise conflicts of interest between the indemnifying party and the indemnified party, the indemnified party may retain counsel satisfactory to it, and the indemnifying party shall pay all reasonable fees and expenses of such counsel for the indemnified party promptly as statements therefor are received; provided, that the indemnifying party shall not be liable for any settlement effected without its prior written consent (which consent shall not be unreasonably withheld or delayed).  Each of the parties agrees to cooperate fully with each other in connection with the defense, negotiation or settlement

8

of any such proceeding, claim or demand and to provide all reasonably available information to the indemnifying party upon its reasonable request. The provisions of this Section shall survive the termination of this Agreement.

D.   **Other Remedies.** The indemnification provided under this Section is in addition to all other available remedies at law or in equity for breach of any provision of this Agreement.

10.   **WARRANTY.**

A.   **Title.** Thione warrants that it is the exclusive owner of all right, title and interest in and to all Products to be sold to Licensee, free and clear of all security interests, encumbrances, liens or charges of any kind.

B.   **Regulatory Requirements.**

1.   **Thione.** Thione represents and warrants that, as of the date hereof, to the best of its knowledge, (i) it has obtained all material governmental and regulatory approvals, licenses, permits and consents which are required by it to market and distribute the Products within the Territory, (ii) the Products are not prohibited or otherwise restricted from being introduced or delivered by it for introduction or shipment in commerce within the Territory, and (iii) the Product otherwise materially complies with all applicable laws, rules, regulations and other regulatory requirements within the Territory, including, without limitation, those relating to product safety and environmental protection. In the event that any modification to the Products' labeling, packaging or instructions is or becomes necessary in order for the Products lawfully to be sold in the Territory, Licensee shall cause such modification to be made at its sole cost. In the event that any modification to the Products' design or formulation is or becomes necessary in order for the Products lawfully to be sold in the Territory, Thione shall evaluate whether a modification can feasibly be made both from a design and cost perspective, however, Thione shall have no obligation hereunder to perform a modification to the Products. If no such modification is made and the Product(s) can no longer be lawfully sold in the Territory, this Agreement shall terminate with respect to such Product(s).

2.   **Licensee.** Licensee represents and warrants that, as of the date hereof, to the best of its knowledge, (i) it has obtained all material governmental and regulatory approvals, licenses, permits and consents which are required by it to manufacture, store, handle, promote, advertise, market, sell and distribute the Products within the Territory, (ii) the Products shall not be prohibited or otherwise restricted from being introduced or delivered by it for introduction or shipment in commerce within the Territory, and (iii) the Products shall otherwise materially comply with all applicable laws, rules, regulations and other regulatory requirements within the Territory, including, without limitation, those relating to product safety and environmental protection. Upon written notification to Licensee that Thione has entered into an exclusive supply, distribution and/or licensing arrangement for the Products for another territory, Licensee agrees that following receipt of such notice, it will no longer sell Products to customers within such other territory without the express written consent of Thione.

9

C. **Proprietary Rights.** As of this date, to the best of its knowledge, Thione represents, warrants and covenants to Licensee as follows:

(1) No Infringement. Neither the granting of the rights and privileges granted hereunder nor the exercise thereof by Licensee in accordance with the terms of this Agreement will infringe or otherwise violate the proprietary rights of any person or entity under any patent, trademark, copyright, trade secret or otherwise.

(2) No Adverse Claims. Thione (i) has not been and is not, as of the date of this Agreement, a party to any litigation enforcing or defending its rights in, to or with respect to the Products, (ii) is not aware of any claims or demands made or threatened by any person or entity involving the validity of its rights in, to or with respect to the Products, and (iii) is not aware of any patents, trademarks, copyrights, devices, processes, methods or other intellectual property rights owned or controlled by any third party which may infringe or be infringed by the Products.

(3) Applicable Copyrights, Patents, Trademarks and Licenses. Subject to the provisions of Section 13 hereof (regarding confidentiality), Thione will provide Licensee with true, correct and complete copies or abstracts of all such , patents, patent applications, trademark registrations, trademark applications,  and instruments relating to the Products (and all amendments, supplements and modifications thereof) as it shall obtain, file or enter into during the term of this Agreement.

(4) No Warranty By Licensee. Thione acknowledges that, Licensee, by executing this Agreement and exercising its rights hereunder, makes no representation, warranty, endorsement or certification regarding the effectiveness, quality, character or fitness of (i) the design or specifications of the Products, as established by Thione or (ii) any products not manufactured by or expressly on behalf of Licensee.

D. Product Warranty: Returns. Thione warrants that all units of (1) the Test Kit to be provided under this Agreement shall be designed and manufactured in accordance with good commercial practices and suitable for its intended purposes; and (2) that the ingredients in the Dietary Supplement provided under this Agreement shall substantially conform to the Product specifications as described in the certificate of analysis, attached in Exhibit A. Products shipped by Thione to or for the benefit of Licensee shall for a period of one hundred eighty (180) days after receipt of such Products by Licensee thereof, be free of all defects in material and workmanship and shall conform to the manufacturer's specifications therefor under normal use and service. The foregoing warranty shall be for the benefit of Licensee and all persons and entities purchasing the Products from or through Licensee, all of whom shall be third-party beneficiaries of such warranty. Licensee may return any Product which is not as so warranted. Thione, at its option, shall replace or refund the purchase price of all such returned units of the Products. The warranty set forth in this Section10.D(1) and (2) for failure to meet specifications shall not extend to units of the Products which have been misused or neglected. Licensee shall have no right to return any unit of the Products for any reason whatsoever other than the failure of such Products to conform to the warranty set forth in this Section 10.D(1) or (2) above.

10

11.     **Force Majeure**. Neither party hereto shall be liable for failure or delay in performing any of its obligations hereunder if such failure or delay is occasioned by compliance with any governmental regulation, request or order, or by circumstances beyond the reasonable control of the party so failing or delaying, including acts of God, war, insurrection, fire, flood, accident, riot, labor strikes, work stoppage or slowdown (whether or not such labor event is within the reasonable control of the parties), delay in obtaining or inability to obtain any required approvals or inability to obtain raw materials, supplies, power or equipment necessary to enable such party to perform its obligations hereunder. Each party shall (a) promptly notify the other in writing of any such event of force majeure, the expected duration thereof and its anticipated effect on the ability of such party to perform its obligations hereunder and (b) make reasonable efforts to remedy any such event of force majeure. If any such event of force majeure shall continue for more than six consecutive months, either party may terminate this Agreement upon both written notice to the other party, without liability to the other party except for payments accrued and payable as of the date of termination.

12.     **TIME OF ESSENCE**. Time is of the essence with respect to each provision of this Agreement.

13.     **CONFIDENTIAL INFORMATION AND INTELLECTUAL PROPERTY**.

A.     **Confidentiality**. The parties agree that all information disclosed in oral, written, graphic, photographic, recorded, diagramed, digital, electronic or in any other form to it by the other party shall be treated as "Confidential and Proprietary Information" and such party and its members, managers, officers, employees, attorneys and agents will carefully guard and protect all such Confidential and Proprietary Information and will not disclose it to any other person, either orally or in writing, unless first authorized by the disclosing party in writing. Upon termination of this Agreement, the parties agree to return at once all originals of any Confidential and Proprietary Information furnished to it by the other party without retaining any copies or summaries of any such Confidential and Proprietary Information.

B.     **Intellectual Property**. All patents and trademarks identified herein shall be the sole and exclusive property of Thione. Licensee acknowledges that it has no interest in Thione's patents, copyrights, trademarks, trade names, or other intellectual or industrial properties (the "Intellectual Property") and Licensee shall at all times, recognize, respect and protect Thione's rights of ownership of any Intellectual Property related to the Products. Products made in accordance with any modification, improvement, alteration or enhancement to such Intellectual Property (for whatever reason) shall belong solely to Thione and Licensee specifically disclaims any rights to such products.

C.     **Use of Marks**. Thione hereby grants Licensee a limited non-exclusive, non-assignable license and non-licensable privilege to use the trademarks, trade names, service marks and other trade designations of Thione specified herein ("Thione's Marks") for the term of this Agreement in connection with the sale of the Products, provided that due notice of Thione's proprietary rights is contained on any reproduced material.

D.     **Infringement**. Licensee shall promptly inform Thione of any infringement with respect to any Intellectual Property rights of the Products or Thione's Marks that comes to the attention of Licensee. Then the parties shall discuss possible countermeasures to be taken. Thione shall have the obligation, to bring suit to stop any infringement, violation of or challenge to identified intellectual property rights associated with the Products. Thione shall keep Licensee informed of the status and progress thereof and Licensee shall have the right to participate, at its expense, in any action by counsel of its own choosir . Thione shall not settle or compromise any uch action undertaken by Thion that may have a materia adverse effect upon Licensee or the busir ss represented by the distribution of the

Products without the prior written consent of Licensee, which consent shall not be unreasonably withheld or delayed. Any recovery (whether by award, settlement or otherwise) in any such action undertaken by Thione shall, after providing for reimbursement of the parties for their actual out-of-pocket expenses incurred in connection with such action, be allocated among the parties hereto as their interests may appear.

14. **NO WAIVER**. The waiver of any default under this Agreement by either party shall not constitute a waiver of the right to terminate this Agreement for any subsequent or like default, and the exercise of the right of termination shall not impose any liability by reason of termination nor have the effect of waiving any damages to which the terminating party might otherwise be entitled.

15. **FURTHER ACTIONS.** The parties agree to execute such additional documents and to perform all such other and further acts as may be necessary or desirable to carry out the purposes and intents of this Agreement.

16. **NOTICE**. All notices, requests, demands and other communications under this Agreement or in connection therewith shall be given to or be made upon the respective parties hereto at the following addresses:

If to Thione:

> Thione International
> Attention:  Mr. Mark Hersh
> 2989 Piedmont Rd.
> Suite 200
> Atlanta, GA 30305-2700

If to Licensee:

> Advanced BodyCare Solutions, LLC
> Attention:  Mr. Carl Pradelli
> 2600 N. Military Trail, Suite 410
> Boca Raton, FL 33431

Except for purchase orders which may be dispatched via first class mail, fax or e-mail, all other notices, requests, demands, and other communications given or made in accordance with the provisions of this Agreement shall be in writing, shall be forwarded by certified mail or recognized over-night carrier and shall be deemed to have been given when deposited postage prepaid, addressed as specified in the preceding sentence.

17. **PRODUCT RECALL.** The parties agree that in the event of a product recall of any Product by any governmental authority, this Agreement will then require renegotiation between the parties to reflect the added difficulties imposed upon Licensee (its affiliates and its subdistributors) in attempting to distribute the Products after the changed market circumstances arising from the adverse effects of such recall.

18.   **BENEFIT.** This Agreement shall be binding upon and inure to the benefit of the heirs, legal representatives, successors, and the permitted assigns of the parties hereto. This Agreement is personal to the parties hereto and subject only as herein permitted, neither party shall be entitled to assign or sub-contract all nor any part of the rights granted hereunder without the prior written consent of the other party (such consent not to be unreasonably withheld or delayed) except to another entity substantially controlled by it.

19.   **AMENDMENT.** No amendment of this Agreement shall be effective unless embodied in a written instrument executed by all of the parties.

20.   **INTEGRATION.** This Agreement represents the entire understandings and agreements of the parties and supersedes any prior representations and agreements, oral or written.

21.   **SEVERABILITY.** All of the provisions of this Agreement are intended to be distinct and severable. If any provision of this Agreement is or is declared to be invalid or unenforceable in any jurisdiction, it shall be ineffective in such jurisdiction only to the extent of such invalidity or unenforceability. Such invalidity or unenforceability shall not affect either the balance of such provision, to the extent it is not invalid or unenforceable, or the remaining provisions hereof, nor render invalid or unenforceable such provision in any other jurisdiction.

22.   **COUNTERPARTS.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same Agreement. This Agreement may be executed and delivered via electronic facsimile transmission with the same force and effect as if it were executed and delivered by the parties simultaneously in the presence of one another

23.   **INCORPORATION OF RECITALS.** The Recitals set forth at the beginning of this Agreement are incorporated herein.

24.   **AUTHORITY.** The individuals executing this Agreement on behalf of the party to be charged represent and warrant that they have full and complete authority to bind their principal to the terms and conditions of this Agreement.

25.   **NO RESTRICTIONS.** The parties represent and warrant that the creation and performance of the obligations arising under this Agreement does not violate and is not in conflict with any other obligation, order, decree, rule or law which may be applicable.

26.   **CAPTIONS.** Captions and headings are for convenience only and are not intended to alter the meaning or interpretation of this Agreement.

27.   **DISPUTES.**

A.   The parties recognize that disputes as to certain matters may from time to time arise which relate to either party's rights and/or obligations hereunder. It is the objective of the parties to establish procedures to facilitate the resolution of such disputes in an expedient manner by mutual cooperation and without resort to litigation. To accomplish this objective, the parties agree to follow the procedures set forth below and when such a dispute arises between the parties.

B.      If any dispute arises between the parties relating to the interpretation, breach or performance of this Agreement or the grounds for the termination thereof, and the parties cannot resolve the dispute within thirty (30) days of a written request by either party to the other party, the parties agree to hold a meeting, attended by the Chief Executive Officer or President of each party, to attempt in good faith to negotiate a resolution of the dispute prior to pursuing other available remedies. If, within sixty (60) days after such written request, the parties have not succeeded in negotiating a resolution of the dispute, such dispute shall be submitted to non-binding arbitration or mediation with a mutually agreed-upon, independent arbitrator or mediator. The arbitration or mediation proceedings shall be held in *Atlanta, Georgia*. Each party shall bear its own costs and legal fees associated with such arbitration or mediation. If no resolution acceptable to both parties is reached through arbitration or mediation, either party may resort to instituting legal action against the other in court and all rights and remedies of the parties shall be preserved in such action. This Agreement shall be interpreted in accordance with the laws of the State of Georgia.

28.     **NO AGENCY CREATED.**  Neither party shall hold itself out to be the agent or employee of the other party and at no time shall either party hold itself out to be a partner or joint venturer of the other party. Neither party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party with regard to any contract, agreement or undertaking with a third party.

29.     **SURVIVAL.**  The provisions of Sections 4(C), 9, 13, 20, 21 and 27 shall survive the termination of this Agreement.

IN WITNESS WHEREOF the parties have executed this Agreement on the date first mentioned above.

**Thione International, Inc.**                        **Advanced BodyCare Solutions, LLC**

By_____              By_____
Wendy K. Barkin, its                                    Carl M. Pradelli, its
Vice President and General Counsel             CEO & President

14

# EXHIBIT A-1
# DIETARY SUPPLEMENT FORMULATION #25

| | Formulation # 25 |
|---|---|
| | For inclusion in: Immune Boosting/Anti-Aging Lozenge |
| One serving = | Se – 70.00 mcg<br>GSH – 50.00 mg<br>NAC – 50.00 mg |
| F.O.B. Price/kg | $326.00 |
| Amount of bottles (30 ct.) per kilo of Thione Complex™ | Unit cost of Thione Complex™ per tablet (one serving) = ~ $0.032<br><br>Unit cost of Thione Complex™ per bottle (30 ct.) = $0.98<br><br>One serving= 100.07 mg, x 30 = 3.021 grams of TAC per 30 ct. bottle<br><br>1 kilo of Thione Complex™ = 332 bottles (30 servings/bottle) |

- Thione Antioxidant Complex™ Shelf Life is 2 years from date of manufacture

# EXHIBIT A-2
## DIETARY SUPPLEMENT FORMULATION #30

|  | Formulation # 30 |
|---|---|
|  | For inclusion in: Immune Boosting/Anti-Aging Lozenge |
| One serving = | Se – 70.00 mcg<br>GSH – 100.00 mg<br>NAC – 100.00 mg |
| F.O.B. Price/kg | $326.00 |
| Amount of bottles (30 ct.) per kilo of Thione Complex™ | Unit cost of Thione Complex™ per tablet (one serving) = ~ $0.07<br><br>Unit cost of Thione Complex™ per bottle (30 ct.) = $2.03<br><br>One serving= 200.07 mg, x 30 = 6.21 grams of TAC per 30 ct. bottle<br><br>1 kilo of Thione Complex™ = 161 bottles (30 servings/bottle) |

- Thione Antioxidant Complex™ Shelf Life is 2 years from date of manufacture

16

# EXHIBIT A-3
# DIETARY SUPPLEMENT FORMULATION #29

| | Formulation # 29 |
|---|---|
| | For inclusion in: Immune Boosting/Anti-Aging Lozenge |
| One serving = | Se – 70.00 mcg<br>GSH – 50.00 mg |
| F.O.B. Price/kg | $612.00 |
| Amount of bottles (30 ct.) per kilo of Thione Complex™ | Unit cost of Thione Complex™ per tablet (one serving) = ~ $0.032<br><br>Unit cost of Thione Complex™ per bottle (30 ct.) = $0.96<br><br>One serving= 50.07 mg. x 30 = 1.50 grams of TAC per 30 ct. bottle<br><br>1 kilo of Thione Complex™ = 636 bottles (30 servings/bottle) |

- Thione Antioxidant Complex™ Shelf Life is 2 years from date of manufacture

# EXHIBIT A-4
## DIETARY SUPPLEMENT FORMULATION #31

| | Formulation # 31 |
|---|---|
| | For inclusion in: Immune Boosting/Anti-Aging Lozenge |
| One serving = | Se – 70.00 mcg<br>GSH – 100.00 mg |
| F.O.B. Price/kg | $612.00 |
| Amount of bottles (30 ct.) per kilo of Thione Complex™ | Unit cost of Thione Complex™ per tablet (one serving) = ~ $0.07<br><br>Unit cost of Thione Complex™ per bottle (30 ct.) = $1.97<br><br>One serving= 100.07 mg. x 30 = 3.21 grams of TAC per 30 ct. bottle<br><br>1 kilo of Thione Complex™ = 311 bottles (30 servings/bottle) |

- Thione Antioxidant Complex™ Shelf Life is 2 years from date of manufacture

18

# EXHIBIT B-1
## FREE RADICAL MONITOR TEST KIT
## WHOLE TEST KIT

| Product | Description | Quantity | Unit Price (USD) |
|---|---|---|---|
| Free Radical Monitor Kit (2 Tests per kit) | *Antioxidant Home Test Kit* | 10,000 | $4.95 |
| | | 25,000 | $4.25 |
| | | 50,000 | $3.95 |
| | | 100,000 | $3.75 |
| | | | |
| One time set up fee for private labeling graphics | Plates: | 1 | $954.00 |
| | Die: | 1 | $1,035.80 |
| | Film/Proof | 1 | $524.70 |

First quantity reflects minimum order requirement.

Product Shelf Life – 3 years from date of manufacture

Printing: 4 Colors & Varnish

Carton Size: 6 1/16 x 3 1/32 x 5 11/16

Die Cut and Scored inner card: 5 15/16 x 5 9/16

Note: Industry Standard is +/- 10% of ordered quantity.

19

# EXHIBIT B-2
## FREE RADICAL MONITOR TEST KIT
## COMPONENTS ONLY

| Product | Description | Quantity | Unit Price (USD) |
|---|---|---|---|
| Free Radical Monitor Ampoule | Fill( 1 ml reagent)Ampoule, 5 ml | 5,000 | $1.80 each |
| | | 25,000 | $1.65 each |
| | | 50,000 | $1.50 each |
| | | 100,000 | $1.25 each |
| | | | Price Per Thousand |
| Free Radical Monitor Pipette | Transfer Pipette, Graduated 1 ml, 3 ml volume, Polyethelene | 5,000 | $117.00/M |
| | | 25,000 | $105.00/M |
| | | 50,000 | $90.00/M |
| | | 100,000 | $75.00/M |
| | | | |
| Free Radical Monitor Breaker | Breaker, plastic for 5 ml ampoule | 5,000 | $95.00/M |
| | | 25,000 | $85.00/M |
| | | 50,000 | $75.00/M |
| | | 100,000 | $60.00/M |

First quantity reflects minimum order requirement

Product Shelf Life – 3 years from date of manufacture

Note: Industry Standard is +/- 10% of ordered quantity.

# EXHIBIT C
# GRANDFATHERED ACCOUNTS

In accordance with the provisions of Section 3(C) and without limiting any other rights Thione may have, Thione shall be expressly permitted to promote, sell or otherwise incorporate the Thione Antioxidant Complex™ into:

1.  a Vitamin C preparation;
2.  a mint or candy with Vitamin C and/or zinc for prevention or treatment of colds or flu

21

# EXHIBIT D
## BRAND LOGO SPECIFICATIONS

### Logo - Thione Complex Inside™

To help consumers identify products that contain the Thione Complex™, Thione requires manufacturers licensing the Thione Complex Inside™ formula to place the trademark logo on labels and/or cartons. Placement Guidelines for labels and/or cartons are as follows:

1.     Product Labels: **Thione Complex Inside™** logo must be no smaller than 0.373" width by 0.398" height, text size no smaller than 3 pts., placed on front panel or the same panel as the Supplemental Facts or Ingredient List.
2.     Product Cartons: **Thione Complex Inside™** logo must be no smaller than 0.5" width by 0.528" height, text size no smaller than 4 pts., placement on front panel or same panel as Supplement Facts or Ingredient list.
3.     PMS Color: **Thione Complex Inside™** logo swirl is 1655 with black text.  PMS color may not be changed without prior authorized consent from Thione International, Inc.





# EXHIBIT 2



 BUCKINGHAM, DOOLITTLE & BURROUGHS, LLP
Attorneys & Counselors at Law

5355 Town Center Road, Suite 900, Boca Raton, FL  33486
561.241.0414   Toll-Free 800.682.2825   Fax 561.241.9766   www.bdblaw.com

**Scott J. Topolski, Esq.**
Direct Line: 561 995-2987
Direct Fax:  330 252-5237
E-Mail: stopolski@bdblaw.com

Akron
Boca Raton
Canton
Cleveland
Columbus
West Palm Beach

September 26, 2006

## VIA FEDERAL EXPRESS

Thione International, Inc.
3201 Andrews Court N.W.
Atlanta, GA 30305

Attn:   Dr. Theodore Hersh

Re:   Advanced BodyCare Solutions, LLC v. Thione International, Inc.
      Our File No. 58567.0006

Dear Dr. Hersh:

Please be advised that this office represents Advanced BodyCare Solutions, LLC in connection with the above-captioned matter.

Thione International, Inc. has converted for/to its own use and benefit the sum of $72,450.00, representing monies paid by my client for products never delivered by Thione International, Inc. to Advanced BodyCare Solutions, LLC.  This sum was paid to Thione International, Inc. by Advanced BodyCare Solutions, LLC on or about January 7, 2005.

Thione International, Inc.'s actions constitute theft under Fla. Stat. § 812.014.

Accordingly, pursuant to Fla. Stat. § 772.11, demand is hereby made that Thione International, Inc. pay to my client the sum of $217,350.00, which is three times the amount of the subject funds, within thirty (30) days.

Thione International, Inc.'s failure to pay the above amount will leave my client with no choice but to bring a civil claim for treble damages, attorney's fees and costs against Thione International, Inc. under Fla. Stat. § 772.104.

GOVERN YOURSELF ACCORDINGLY.

Very truly yours,

Scott J. Topolski

SJT/blc
cc:   Beth Geller, Esq.
◄BOCA:123776_v1►

**JS 44** (Rev. 11/05)  **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

### I. (a) PLAINTIFFS
Advanced Bodycare Solutions, LLC

### DEFENDANTS
Thione International, Inc.

**CIV-HURLEY**

**(b)** County of Residence of First Listed Plaintiff  Palm Beach
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Fulton
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Scott Topolski, Buckingham, Doolittle & Burroughs, LLP
5355 Town Center Rd., Suite 200
Boca Raton, FL 33486

**06-81128**

Attorneys (If Known)
Gary C. Rosen, Esq., Patrick de Gravelles, Esq.

**HOPKINS**

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☑ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  HIGHLANDS

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☑ 4  Diversity (Indicate Citizenship of Parties in Item III)

*9:06 CV 81128 - Hurley*

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)  and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product / Med. Malpractice | ☐ 625 Drug Related Seizure | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability / ☐ 365 Personal Injury - | of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & / Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander / ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Injury Product | ☐ 650 Airline Regs. | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability / Liability | ☐ 660 Occupational | | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine / **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product / ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle / Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability / ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal / Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment / Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ / **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations / ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - / ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment / ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - / ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | |

### V. ORIGIN (Place an "X" in One Box Only)
☐ 1 Original Proceeding   ☑ 2 Removed from State Court   ☐ 3 Re-filed- (see VI below)   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. RELATED/RE-FILED CASE(S).
(See instructions second page):   a) Re-filed Case ☐ YES ☐ NO   b) Related Cases ☐ YES ☐ NO

JUDGE ____  DOCKET NUMBER ____

### VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause **(Do not cite jurisdictional statutes unless diversity):**
28 U.S.C. Section 1332

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ ____   CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE  12|6|06

Patrick de Gravelles   FOR OFFICE USE ONLY   AMOUNT 350.00   RECEIPT # 538889