UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-81128-CIV- HURLEY

**ADVANCED BODYCARE
SOLUTIONS LLC,**

      **Plaintiff,**

vs.

**THIONE INTERNATIONAL, INC.,**

      **Defendant**.
_____/

### ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND DENYING STAY OF PROCEEDINGS PENDING ARBITRATION

**THIS CAUSE** is before the court on the defendant's motion to dismiss for lack of personal jurisdiction, or alternatively, to stay proceedings pending arbitration. [DE # 3]. For reasons discussed below, defendant's motion shall be denied.

### I. Background[1]

Plaintiff Advanced BodyCare Solutions LLC ("ABCS"), a Delaware corporation with its principal place of business in Palm Beach County, Florida, is in the business of developing, marketing, and distributing nutritional supplements and other topical products. Defendant Thione International Inc. ("Thione") is a Georgia based health care technology company that designs, formulates and develops patents, applications, and clinical research.

---

[1] The background facts are drawn from the plaintiff's operative Complaint [DE# 1], the allegations of which are accepted as true to the extent they are not contradicted by the defendant's jurisdictional affidavits filed in support of its pending motion to dismiss.

-1-

In April 2004, ABCS and Thione entered into a supply and licensing agreement which gave ABCS the exclusive North America license to market and distribute Thione Antioxidant Complex™, an anti-aging, patented dietary supplement designed to reduce free radical damage to the human body. Under this agreement, ABCS acquired distribution rights over two Thione products – dietary supplements and free radical test kits – which Thione agreed to ship to any "such location(s) as specified by [ABCS] in its purchase orders."

On May 26, 2004, ABCS ordered 25,000 test kits and wired a $41,250.00 payment into Thione's bank account. Thione shipped the kits, which included ampoules, or small vials, to ABCS's warehouse in Orlando, Florida. Thione CEO Theodore Hersh acknowledges, via affidavit, that he was aware that the buyer's "ship to" instruction in the May 26, 2005 purchase order specified a delivery address in Orlando, Florida..[2]

On June 28, 2004, ABCS ordered a shipment of the dietary supplement and wired $15,300 to Thione's bank account. Upon receipt of this order, Thione shipped "Thione Complex,™" the primary ingredient in the tablet, to ABCS' designated manufacturer, Garden State Nutritional, in New Jersey. From there, Garden State shipped the final formulation of the dietary supplement to ABCS' warehouse in Orlando, Florida.

After accepting delivery of the test kits on September 1, 2004, ABCS discovered a defect in the ampoules component of the shipment, finding numerous broken ampoules and over 1000

---

[2] Hersch goes on to make the statement that "Thione was not involved in that shipment," the import of which is not entirely clear. [Hersh Affidavit, ¶ 26] Presumably, this comment is intended to echo Thione's position that shipping arrangements under the license and supply agreement were always made at the election of ABCS, and that Thione's lack of involvement in directing that choice rendered it "uninvolved" in the shipment.

unbroken ampoules marked by a strange pinkish color. ABCS immediately contacted Thione, which instructed it to collect and retain the evidence to file a claim with the shipping company. Despite this initial quality control problem with the test kit shipment, the parties continued working on a marketing plan and made related preparations to film a televison commercial. To this end, CEO Theodore Hersh made a two day trip to Florida to film an infomercial pursuant to a requirement in the parties' licensing agreement requiring "Dr. Hersh to be available to [ABCS] on a reasonable basis to support the market position of the products."

By the end of December, 2004, ABCS discovered more of the ampoules inventory turning pink. It again notified Thione of the problem, this time sending a sample box of the defective product back to Thione for inspection via overnight delivery. In April 2004, Thinone acknowledged the defect, which tainted approximately 50% of the test kit ampoules, and promised to replace it the defective product. In October 2005, Thione shipped 6734 new ampoules to ABCS's warehouse in Orlando, but, according to ABCS, this still left it with 6000 defective ampoules which were never replaced.

On December 6, 2006, ABCS filed the instant suit for breach of warranty claim against Thione. The case is now before the court on Thione's motion to dismiss for lack of personal jurisdiction, or alternatively, for a stay of proceedings pending arbitration.

## II. Standard of Review

The determination of whether a court has personal jurisdiction over a nonresident party involves a two-part analysis. *See Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829 (11th Cir.1990); *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989). First, the court must determine whether the applicable state statute governing personal jurisdiction

is satisfied.  Next, the court must determine whether the exercise of personal jurisdiction comports with the due process requirements of the Fourteenth Amendment.  *See  Future Tech. Today, Inc. v. OSF Healthcare Systems*, 218 F.3d 1247, 1249 (11th Cir. 2000).

The federal due process constitutional analysis requires that the nonresident has sufficient "minimum contacts" with the forum state so that  maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *International Shoe v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945);  *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 256 (11th Cir.1996).

Once the plaintiff pleads sufficient material facts to support the exercise of *in personam* jurisdiction under the long arm statute, the burden shifts to the defendant to challenge plaintiff's allegations by affidavits or other competent evidence. *Lauzon v. Joseph Ribkoff, Inc.*, 77 F. Supp. 2d 1250, 1253-54 (S.D. Fla. 1999).  If the defendant sustains this burden, plaintiff must then substantiate the jurisdictional allegations by affidavits or other competent proofs,  and may not simply restate the factual allegations presented in its complaint.  *Id.;  Murphy v. Republic Health Corp.*, 645 F. Supp. 124 (S.D. Fla. 1986).

### III.  Discussion

#### A. Florida's Long Arm Statute

The Florida long-arm statute allows for two distinct, alternative categories of personal jurisdiction: specific jurisdiction conferred under Fla. Stat. § 48.193(1) and general jurisdiction conferred under Fla. Stat. § 48.193(2).  *See Miller v. Berman,* 289 F. Supp. 2d 1327, 1331 (M.D. Fla.2003); *Northwestern Aircraft Capital Corp. v. Stewart*, 842 So. 2d 190, 193 (Fla. 5th Dist. Ct. App. 2003). A court may exercise general jurisdiction over a party whose contacts with the forum

are unrelated to the litigation, but nonetheless are "continuous and systematic." *Horizon Aggressive Growth v. Rothstein-Kass*, 421 F.3d 1162, 1166 (11th Cir. 2005). Conversely, a court may exercise specific jurisdiction over a nonresident defendant when the cause of action asserted arises from or is directly related to the defendant's contacts with the forum. *Id.*

In this case, plaintiff asserts both prongs of the long arm statute as a premise for the exercise of this court's jurisdiction over Thione. Because the court agrees that specific jurisdiction may be premised upon § 48.193(1)(g) based on Thinone's alleged breach of a contract in this state "by failing to perform acts required by the contract to be performed in this state," it is unnecessary to examine the various alternative jurisdictional premises asserted.

### 1. § 43.193(1)(g)- Breaching a Contract in Florida

The Florida long-arm statute confers specific jurisdiction over a non-resident defendant who breaches "a contract in this state by failing to perform acts required by the contract to be performed in this state." Fla. Stat. § 48.193 (1). In this case, ABCS alleges that on May 26, 2004, Thione breached its contract to deliver 25,000 test kits to ABCS[3] in Florida by causing a shipment of kits containing broken ampoules to be delivered to plaintiff's warehouse in Orlando, and then failing to correct this failure to perform with a complete replacement of the defective goods.

The defendant does not deny this sequence of events, and in fact acknowledges that the ABCS purchase order for the test kits specifically called for delivery of the product at the ABCS warehouse in Orlando, Florida. However, Thione argues that because ABCS held the option of electing the delivery location for goods supplied to it for distribution under the contract, and because

---

[3]The supply and licensing agreement contains a product warranty provision and explicitly requires that the products be "designed and manufactured in accordance with good commercial practices" and be "free of all defects." *See* [DE # 4-2 ¶10(D)].

-5-

Thione did not participate in that delivery designation, the contract in question did not require a delivery in Florida and Thione cannot be pulled in under the Florida long arm statute for breaching a contract in this state by failing to perform an act required by the contract to be performed in this state.

Similarly, with respect to the dietary supplement shipment, it argues that because it did not directly ship the product to Florida, but rather routed it through plaintiff's manufacturer, Garden State Nutritional, in New Jersey, it cannot be said to have "failed to perform acts required by the contract to be performed" in the state of Florida for purposes of triggering § 48.193(1)(g) of the Florida long-arm.

The court disagrees with both assessments. Based on the specific facts set forth in the complaint, it appears that Thione selected a Florida based company to serve as its exclusive distributor in North America, and contracted to deliver its product to that corporation in Florida. When the product was delivered, it did not conform to the specifications and requirements agreed upon under the contract. Hence, a breach of the contract occurred in the State of Florida at the point of delivery of the nonconforming goods. Because defendant's opposing jurisdictional affidavit does not refute these central allegations, plaintiff is under no duty to further support its allegations by affidavit or other proof.

Thus, personal jurisdiction may be exercised over Thione under § 48.193(1)(g) for an implied breach of warranty. *See E-One, Inc. v. R. Cushman & Assocs.,* No. 05-CIV-209-Oc, 2006 U.S. Dist. LEXIS 67617 at * 24 (M.D. Fla. May 15, 2006); *Baker Electronics, Inc. v. Pentar Systems, Inc.*, 219 F. Supp.2d 1260, 1263 (M.D. Fla. Aug. 20, 2002); *Aetna Life & Cas. Co. vs Therm-O-Disc, Inc*. 488 So.2d 83 (Fla. 1st DCA 1986)(jurisdiction under § 48.193(1)(g) sustained

against manufacturer which contracted to deliver switches in Florida which did not conform to the agreed upon specifications and requirements upon delivery). See also *Wetzel v. Fisherman's Wharf of Pompano Beach, Inc.*, 771 So.2d 1195, 1198 (Fla. 2000)(amenability to suit under Florida long arm is driven by the defendant's business activities directed toward the State – "not by focusing solely on how [its] product....entered the state").

## B. Due Process Requirements

The examination next turns to whether plaintiff has established the existence of sufficient "minimum contacts" with Florida so that the exercise of jurisdiction over this defendant would not offend "traditional notions of fair play and substantial justice." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 463 (1985).

The Eleventh Circuit utilizes a three part test for determining whether sufficient minimum contacts exist to satisfy the due process requirements attendant to exercise of long-arm jurisdiction: (1) First, a defendant must have "fair warning" that a particular activity may subject it to the jurisdiction of a foreign sovereign; (2) Second, the defendant's conduct and connection with the forum must be such that it should reasonably anticipate being haled into court in that forum; and (3) Third, viewing the defendant's contacts with the forum in light of all other factors, the exercise of personal jurisdiction must comport with "fair play and substantial justice." *Madara v Hall*, 916 F.2d 1510 (11th Cir. 1990).

In the latter regard, the relevant factors for consideration include the burden on defendant in defending the lawsuit in the foreign forum, the forum's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, and the interstate judicial's system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the

states in furthering fundamental substantive social policies.

In this case, defendant argues that it did not purposefully direct the sale of its ampoules to plaintiff in Florida. It emphasizes that it did not control the place of delivery under the contract, but rather, the contract left the shipping arrangements up to ABCS, which in its sole discretion happened to direct a shipment of the test kits to its Orlando warehouse, and happened to direct a shipment of Thione Complex™ to its New Jersey manufacturer, which later shipped the final formulated product to ABCS in Florida.

Thione cannot so easily divorce itself from the movement of its product, however. Unless a product enters the Florida market by "fortuitous circumstances," a manufacturer who sells a product in Florida cannot reasonably contend that it should not reasonably foresee being being haled into a Florida court in the event of a dispute over the quality of that product. *See e.g. Pollution Prevention Services, Inc. v Inter Recycling Inc.*, 1996 WL 378990 (M.D. Fla. 1996), citing *A. J. Sackett & Sons Co. v Frey*, 462 So.2d 98 (Fla. 2d DCA 1985).

In this case, Thione selected a Florida-based corporation as its exclusive North America distributor. With this election, it cannot reasonably contend that the movement and delivery of its products in this state occurred under fortuitous circumstances. As to the initial test kit shipment, defendant knowingly shipped the product directly to ABCS's Orlando warehouse per shipping instructions of ABCS, and later replaced a portion of that shipment with another direct shipment of the product to ABCS in Orlando. As to the dietary supplement, defendant knowingly shipped a primary ingredient, Thione Complex,™ to Garden State Nutritional in New Jersey, well aware that Garden State's final formulation of the product was destined for delivery to ABCS in Orlando.

Thus, by its own concessions, Thione intended a delivery of its product to its North American distributor in Orlando Florida. Whether this occurred directly, as in the case of the test kits (containing the defective ampoules), or indirectly, as in the case of the Thione Complex ™ ingredient, the implication that Thione's responsibility for the product ceased once it left its Georgia plant is not persuasive.

As explained by the Florida Third District Court of Appeal in *Life Laboratories, Inc. V Valdes*, 387 So.2d 1009 (Fla. 3d DCA 1980):

> A manufacturer whose products pass through the hands of one or more middle men before reaching their ultimate users cannot disclaim responsibility for the total distribution pattern of the products. If the manufacturer sells its products in circumstances that it knows or should reasonably anticipate that they will ultimately be resold in a particular state, it should be held to have purposefully availed itself of the market for its products in that state.

Recognizing that Thione knowingly selected a Florida based company to serve as its exclusive North American distributor, shipped Thione Complex™ dietary supplement tablets into this State via ABCS' New Jersey middleman manufacturer, and shipped 25,000 home test kits directly to the warehouse of its distributor in this state, it may fairly be concluded that Thione purposefully availed itself of the privilege of using the Florida market as a conduit for the distribution of its goods, and might reasonably have expected to be haled into a Florida court to answer for any liabilities arising that activity.

With this predicate, the court finds sufficient minimum contacts to sustain the exercise of long arm jurisdiction over Thione under 48.193(1)(g) of the Florida long arm, and shall accordingly deny defendant's motion to dismiss for lack of personal jurisdiction.

## IV. Arbitration Agreement

The court next considers whether the Federal Arbitration Act (FAA) obligated ABCS to arbitrate its claims against Thione. This inquiry begins with examination of the following alternative dispute mechanism contained in the parties' contract:

> If any dispute arises between the parties relating to the interpretation, breach or performance of this Agreement or the grounds for the termination thereof, and the parties cannot resolve the disputes within thirty (30) days of a written request by either party to the other party, the parties agree to hold a meeting, attended by the Chief Executive Officer or President of each party, to attempt in good faith to negotiate a resolution of the dispute prior to pursuing other available remedies. If within sixty (60) days after such written request, the parties have not succeeded in negotiating a resolution of the dispute, such dispute shall be submitted to non-binding arbitration or mediation with a mutually agreed upon, independent arbitrator or mediator. The arbitration or mediation proceedings shall be held in Atlanta, Georgia. Each party shall bear its own costs and legal fees associated with such arbitration or mediation. If no resolution acceptable to both parties is reached through arbitration or mediation, either party may resort to instituting legal action against the other in court and all rights and remedies f the party shall be preserved in such action.

[Supply and Licensing Agreement, ¶27.B.]

Section 2 of the FAA provides that " a written provision in ... a contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2. Section 3 of the FAA provides for the stay of proceedings in federal district courts when an issue in the proceedings is referable to arbitration, and Section 4 provides for orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement. See 9 U.S.C. § § 3, 4 (2007). *Bullard v. Capital One,* 288 F. Supp.2d 1256, 1258 (N.D. Fla. 2003).

In this case, ABCS contends that the disjunctive language used to describe the prescribed arbitral forum– "non binding arbitration or mediation" – creates an ambiguity that, at best for Thione, creates a permissive option, rather than a mandatory obligation, to arbitrate which falls outside the enforcement field of the Federal Arbitration Act, 9 U.S.C. §§1-10 (FAA).

Upon careful review of the relevant authorities, the court agrees that the parties' contract does not manifest an intent that arbitration be the exclusive means for addressing a dispute over a breach or termination of the agreement. Rather, by creating an option for the aggrieved party to call for either non-binding arbitration or mediation, the parties have made resort to arbitration the prerogative --not the obligation– of the aggrieved party. That is, this alternative dispute mechanism merely provides a forum for the parties to pursue pre-suit settlement negotiations: Within this forum, the arbitral procedure is simply one option that the aggrieved party may or may not invoke, having the alternative option of pursuing mediation. Because the contract does not require ABCS to invoke the arbitral aspect of the alternative dispute resolution mechanism, and because an agreement to mediate is generally not susceptible to FAA enforcement, *see e.g. Lynn v General Electric Co.*, 2005 WL 701270 (D. Kan. 2005), there was no agreement to arbitrate this dispute within the meaning of the FAA and this court lacks authority to stay the case pending arbitration pursuant to 9 U.S.C. §3. *See Brennan v King*, 139 F.3d 258 (1st Cir. 1998).

Even if the contract called only for non- binding arbitration, the result would be the same because, as the dispute mechanism is structured, there is little ground for reasonable expectation that the procedures prescribed would lead to final resolution of a dispute by the arbiters before resort to litigation. The contract gives the aggrieved party the option of filing suit at any time if no resolution acceptable to both parties is reached by the arbiters. Because the agreement does not

clearly require the parties to arbitrate the dispute through to final decision by the arbiters, it does not mesh with the concept of "arbitration" within the contemplation of the FAA. [4]

Based on the foregoing, the court rejects the defendant's proposition that the word "arbitration" as used in the FAA includes the optional "nonbinding arbitration or mediation" process described in the parties' agreement.  Accordingly, the defendant's motion to stay proceedings pending arbitration filed pursuant to 9 U.S.C. §3 shall be denied.

---

[4]
The FAA does not define the term "arbitration."  The courts have struggled to do so, largely in the context of a debate over whether the FAA applies to nonbinding arbitration.  The Eleventh Circuit has not ruled on this specific issue, and other circuits addressing it have reached varying results.  *Compare  Dluhos v Strasberg*, 321 F.3d 365, 371 (3d Cir. 2003)(non-binding dispute resolution policy did not constitute "arbitration" under the FAA) *with Wolsey LTD v Foodmaker, Inc*., 144 F.3d 1205 (9th Cir. 1998) ("in light of the strong presumption in favor of arbitratibility....we hold that arbitration need not be binding in order to fall within the scope of the Federal Arbitration Act.").

The court agrees with the logic of the Third Circuit, which recognizes "the essence of arbitration....[to be] .. when the parties agree to submit their disputes to it, they have agreed to arbitrate these disputes through to completion, i.e. to an award made by a third party arbitrator.  Arbitration does not occur until the process is completed and the arbitrator makes a decision."  *Harrison v  Nissan Motor Corp.,*  111 F.3d 343, 350 (3d Cir. 1996). Under this approach, the focus is appropriately placed on whether the "arbitration" provision requires the parties to see the arbitral procedure through to completion *Id.*

Under the clause at issue in this case, the aggrieved party would not necessarily be required to see the non-binding arbitration process through to completion before pursing litigation, as the clause gives either party the option of  resorting to legal action at any time 'if no resolution acceptable to both parties is reached through arbitration or mediation."

It is therefore **ORDERED & ADJUDGED**:

(1) Defendant's motion to dismiss for lack of personal jurisdiction is **DENIED.**

(2) Defendant's motion for stay under 9 U.S.C. § 3 is **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 30th day of April, 2007.

                                                                    Daniel T. K. Hurley
                                                            United States District Judge

cc. All counsel